**LAZY SEVEN COAL SALES, INC., and/or Zena Mehler, Executrix of the Estate of Frank T. Mehler, Deceased, Plaintiff–Appellant,**

v.

**STONE & HINDS, P.C., Defendant–Appellee.**

Supreme Court of Tennessee, at Knoxville.

June 17, 1991.

Larry C. Vaughan, Vaughan & Zuker, Knoxville, Neale J. Poller, Hall, Poller & O'Brien, P.A., Miami, Fla., for plaintiff-appellant.

Darryl G. Lowe, Lowe, Hogan, Shirley & Yeager, Robert R. Campbell, Hodges, Doughty & Carson, Knoxville, for defendant-appellee.

## OPINION

REID, Chief Justice.

This case is a civil action for legal malpractice. The estate of Frank Mehler, the real party in interest, appeals from the judgment of the Court of Appeals, which reversed a jury verdict against Stone & Hinds, P.C. (Stone & Hinds), granted Stone & Hinds' motion for directed verdict, and dismissed Mehler's complaint.

The Court of Appeals, in reversing the trial court, held that appellant Mehler failed to prove at trial the standard of care required of the appellee-lawyers and that, further, he had waived any claim against the lawyers by failing to move with reasonable promptness for their disqualification. Mehler seeks reversal of the Court of Appeals' decision and reinstatement of the jury verdict. Stone & Hinds would have this Court affirm the decision of the Court of Appeals and hold further that the evidence preponderates against the jury verdict and that the trial court erred in the admission of evidence, instructions to the jury, and entry of judgment.

This Court finds that the record supports both findings by the Court of Appeals that Mehler failed to prove the standard of care and that he waived any claim based on conflict of interests. In addition, the record contains no material evidence of causation between the acts claimed to constitute negligence and the damages alleged. The other issues are pretermitted.

### Proof

Lazy Seven Coal Sales, Inc. (Lazy Seven) was incorporated in August 1979 by Sam Cox and Frank Mehler for the purpose of engaging in the coal brokerage business. Cox owned 51% of the stock, was designated president, and was responsible for the operation of the business, which involved the purchase and sale of coal. Forty-nine percent of the stock was issued to Mehler, a resident of Palm Springs, Florida, who had no responsibility for the daily management of the business but provided the financial resources for the corporation.

Approximately one year after Lazy Seven was organized, Cox, as president, employed the law firm of Stone & Hinds to act as legal counsel for the corporation. Stone & Hinds' representation continued until the corporation was dissolved in June 1981. During the course of its representation, Stone & Hinds prepared, at Mehler's request, a family voting trust agreement whereby Mehler, or alternately his wife, could vote the shares issued to Mehler, some of which he transferred to his wife and children. The agreement was executed by Mehler and his family members. Stone & Hinds also prepared, at the requests of both Cox and Mehler, drafts of a shareholder's agreement between Cox and Mehler, bylaws for the corporation, and an employment contract between the corporation and Cox as president. None of these instruments were executed because Cox and Mehler were not able to agree upon the terms. The preparation of these instruments by Stone & Hinds and its subsequent representation of the corporation in a controversy with Mehler is the basis for Mehler's claim against Stone & Hinds for legal malpractice.

The controversy, which culminated in the dissolution of Lazy Seven, began on April 17, 1981, when Mehler, who had not been involved in the corporation's daily affairs, went to the corporate office and, insisting the business was being run inefficiently,

made demands upon employees, threatened to fire them, and generally disrupted business. Stone & Hinds, as corporate counsel, advised Cox of possible responses to Mehler's interference. Although Stone & Hinds recommended a compromise with Mehler to resolve any differences, Cox, as president of Lazy Seven, elected to seek a temporary restraining order, a complaint for which Stone & Hinds filed on behalf of Lazy Seven. An order was entered prohibiting Mehler from interfering with the operation of the corporation. Mehler defied the order of the court and instructed the corporation's banks to withhold all payments from corporate funds. Upon proceedings initiated by the chancellor, and after a hearing at which Mehler was represented by counsel, he was found to be in contempt of court.

Mehler filed a counter-complaint seeking the appointment of a receiver, dissolution of the corporation, and distribution of the assets. The court appointed a receiver and subsequently ordered that all claims against Lazy Seven be filed within six months and that the corporation thereafter be dissolved and the assets liquidated. The appointment of a receiver constituted a default by the corporation on a line of credit guaranteed by Mehler and extinguished the corporation's access to operating funds. The court found the shareholders to be bitterly hostile and the corporation insolvent. Lazy Seven, represented by Stone & Hinds, filed a petition in bankruptcy seeking a Chapter 11 reorganization. In order to expedite the dissolution, bankruptcy proceedings were dismissed by consent, and the receiver accepted Mehler's offer to purchase the assets of the corporation, including the right to use the name Lazy Seven Coal Sales, Inc., for ten dollars and the assumption of all corporate debts.

In the course of the dissolution proceedings, Stone & Hinds filed a claim for attorneys' fees in the amount of $22,842.23. Stone & Hinds also filed a claim against the receiver on behalf of a former sales employee of Lazy Seven for commissions due on sales made for the benefit of Lazy Seven. Mehler, approximately one year after the filing of the original complaint, filed a third-party complaint against Stone & Hinds seeking damages for alleged legal malpractice. The jury returned verdicts of $2,600,000 for Mehler against Stone & Hinds and $6,000 for Stone & Hinds against Mehler.

## Standard of Review

■ The Court of Appeals, after examining the evidence, held the trial court in error in not sustaining Stone & Hinds' motion for a directed verdict. In reviewing that action by the Court of Appeals, this Court also must review the record to ascertain if material evidence is present to support the verdict. *Hohenberg Bros. Co. v. Missouri Pacific R.R. Co.*, 586 S.W.2d 117, 119 (Tenn.Ct.App.1979); T.R.A.P. 13(d). This determination must be based on proof that Stone & Hinds owed Mehler a duty, Stone & Hinds breached that duty, and the breach of the duty proximately caused damages to Mehler. *Spalding v. Davis*, 674 S.W.2d 710 (Tenn.1984); *Sammons v. Rotroff*, 653 S.W.2d 740 (Tenn.Ct.App. 1983); *Stricklan v. Koella*, 546 S.W.2d 810, 813 (Tenn.Ct.App.1976).

Although standard of care, causation, and waiver are interrelated and cannot be separated precisely, the issues presented will be discussed under those headings.

## Standard of Care

Mehler insists that the Code of Professional Responsibility is the standard of care in a legal malpractice suit and that proof of a violation of the Code is sufficient basis for liability. Mehler's position is that "a violation of the Code *itself* when coupled with testimony regarding the deleterious results thereof, are and should be sufficient upon which to predicate an action for legal malpractice in Tennessee." (Emphasis added.)

The initial inquiry, whether the Code is the standard of care in an action based on negligence, is answered by the Code itself. The purpose of the Code is set forth in the Preliminary Statement, which includes the following:

The Code is designed to be adopted by appropriate agencies both as an inspirational guide to the members of the profession and as a basis for disciplinary action when the conduct of a lawyer falls below the required minimum standards stated in the Disciplinary Rules.

. . . .

The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to *disciplinary action....* The Code makes no attempt to prescribe either disciplinary procedures or penalties for violation of a Disciplinary Rule, *nor does it undertake to define standards for civil liability of lawyers for professional conduct.* (Emphasis added.)

■ It is clear that the purpose of the Code is to state when a lawyer will be subject to disciplinary action and not to define standards whereby he may be held civilly liable for damages. Conduct that violates the Code may not breach a duty to the client and therefore will not constitute actionable malpractice. Although this issue has not been considered previously by this Court, other jurisdictions have held that the state Code of Professional Responsibility does not create a private cause of action for damages. *See, e.g., Terry Cove North, Inc. v. Marr & Friedlander, P.C.,* 521 So.2d 22 (Ala.1988); *Roberts v. Langdale,* 185 Ga.App. 122, 363 S.E.2d 591 (1987); *Bob Godfrey Pontiac, Inc. v. Roloff,* 291 Or. 318, 630 P.2d 840 (1981); *Martin v. Trevino,* 578 S.W.2d 763 (Tex.Civ. App.1978).

When presented the issue, the Alabama Supreme Court held, "The Code of Professional Responsibility is designed not to create a private cause of action for infractions of disciplinary rules, but to establish a remedy solely disciplinary in nature." *Terry Cove North,* 521 So.2d at 23. The court also found, "The sole remedy [for breaches of disciplinary rules] is the imposition of disciplinary measures. Like the [ABA] Model Code, Alabama's Code of Professional Responsibility does not set out standards for civil liability." *Id.* at 24.

The Court of Appeals of Georgia considered the issue and found, quoting *East River Savings Bank v. Steele,* 169 Ga.App. 9, 311 S.E.2d 189 (1983):

"This court has held previously that an alleged violation of ethical guidelines for attorneys enacted by the legislature could not be the basis for a civil suit against a legal advocate. (Citation omitted.) Indeed, most courts which have directly addressed the question have rejected the notion of implying a civil cause of action for damages arising from a violation of a rule of professional conduct. (Citation omitted.) The better rule appears [to be] (citation omitted) ...: '[A]n alleged violation (of a rule of the Code of Professional Responsibility), *standing alone,* cannot serve as a legal basis to support plaintiff's civil action seeking money damages....' (Emphasis supplied.) (Citation omitted.)."

*Roberts,* 363 S.E.2d at 593. The court then held:

Standing alone, appellant's evidence in the case sub judice merely established that appellee may have violated Georgia's Code of Professional Responsibility. It does not indicate in any way that appellee's representation of and advice to appellant was faulty, thereby causing appellant damages. Consequently, since appellant failed " 'to counter [appellee's] evidence with expert legal testimony establishing the parameters of acceptable professional representation, the trial court properly granted [appellee's motion] for summary judgment. (Citation omitted.)' (Citations omitted.)"

*Id.* (quoting *Patterson v. Lanham,* 182 Ga. App. 343, 355 S.E.2d 738, 740 (1987)).

The Supreme Court of Oregon found that "[a]ll of the courts that have directly considered [the question of whether an attorney's violation of a statutory duty or the Code of Professional Responsibility gives rise to a private cause of action for damages] have held that it does not." *Bob Godfrey,* 630 P.2d at 847. "It also appears that most legal writers on this subject ap-

prove the rule as stated by these courts." *Id.* at 847–48. The court wrote further:

The principal reasons for this rule, as stated in the opinions by these courts, are the following:

(a) The statute or Code of Professional Responsibility was not intended to create a private cause of action. On the contrary, the sole intended remedy for a violation of such a statute or code is the imposition of discipline by disbarment, suspension or reprimand of the offending attorney. (Citations omitted.)

(b) Other remedies, such as malicious prosecution, adequately protect the public from harassment or abuse by unprofessional lawyers. (Citations omitted.)

(c) To expose attorneys to actions for damages for breach of ethical duties imposed by such statutes and codes would be contrary to the "obvious public interest" in affording every citizen "the utmost freedom of access to the courts."

*Id.* at 848.

The Texas Court of Civil Appeals also decided the issue, holding:

The remedy provided pursuant to these sections for the professional misconduct of an attorney is a public one, not a private one. The duties set forth in the Code of Professional Responsibility establish the minimum level of competence required of attorneys for the protection of the public. A violation thereof will not give rise to a private cause of action.

*Martin,* 578 S.W.2d at 770.

The Court of Appeals properly held in this case that the Code of Professional Responsibility is not designed to create a private cause of action for infractions of disciplinary rules but is designed to establish a remedy solely disciplinary in nature.

■ Even though, as set forth above, the Code does not define standards for civil liability, the standards stated in the Code are not irrelevant in determining the standard of care in certain actions for malpractice. The Code may provide guidance in ascertaining lawyers' obligations to their clients under various circumstances, and conduct which violates the Code may also constitute a breach of the standard of care due a client. However, in a civil action charging malpractice, the standard of care is the particular duty owed the client under the circumstances of the representation, which may or may not be the standard contemplated by the Code. Mehler quotes *Woodruff v. Tomlin,* 616 F.2d 924 (6th Cir.1980), a legal malpractice case, as authority that under Tennessee law the Code "constitutes some evidence of the standards required of attorneys." *Id.* at 936. The Sixth Circuit acknowledged in that case, however, that there was no Tennessee authority for the quoted statement. A more complete quotation from the case, as follows, demonstrates the court's meaning:

We recognize that the Code of Professional Responsibility "does not undertake to define standards for civil liability of lawyers for professional conduct." 5A Tenn.Code Ann. p. 89 (1978).

*Woodruff,* 616 F.2d at 936.

The standard of care in actions for legal malpractice in Tennessee is well-settled. In *Spalding v. Davis,* 674 S.W.2d at 710, the Court discussed the standard:

This Court, in 1881, approved this rule as to the obligation of an attorney to his client:

"When a person adopts the profession of the law, and assumes to exercise its duties in behalf of another for hire and reward, he must be held to employ in his undertaking a reasonable degree of care and skill; and if any injury result to the client from want of such reasonable care and skill, the attorney must respond to the extent of the injury sustained." *Bruce v. Baxter,* 75 Tenn. 477, 481 (1881).

This rule was later quoted with approval by this Court in *Hillhouse v. McDowell,* 219 Tenn. 362, 410 S.W.2d 162 (1966). The settled general rule in most if not all American jurisdictions is that an attorney to whom the conduct of litigation is entrusted may be held liable to his client for damages resulting from his failure to exercise ordinary care, skill, and diligence, or, as it is frequently expressed, that degree of care, skill, and diligence

which is commonly possessed and exercised by attorneys in practice in the jurisdiction. See 45 A.L.R.2d 5, 12. In *Stricklan v. Koella*, 546 S.W.2d 810 (Tenn.App.1976), the Court of Appeals held that "in all negligence cases, whether they be automobile related or medical or legal malpractice related, before a recovery can be had, the nexus between the negligence and the injury must be shown." *Id.* at 813.

*Spalding*, 674 S.W.2d at 713–14.

The Court of Appeals, in *Cleckner v. Dale*, 719 S.W.2d 535 (Tenn.Ct.App.1986), elaborated upon the standard to which lawyers are held in civil actions for damages as follows:

The standard of care applicable to a particular case will vary depending upon the type of legal activity involved. The standard of care applicable to civil litigators may not be the same standard applicable to lawyers representing the buyers in a real estate transaction or to lawyers drafting complicated testamentary instruments. The varied nature of the practice of law underscores the necessity of expert proof intended to acquaint the finder of fact with the applicable professional standard in each case.

*Id.* at 540, n. 4.

■ The question then becomes whether the record contains material evidence of the standard of care applicable to this situation. Proof must be by expert testimony. The court in *Cleckner* stated:

Whether a lawyer's conduct meets the applicable professional standards is generally believed to be beyond the common knowledge of laypersons. Thus, except in cases involving clear and palpable negligence, most courts considering the issue have held that cases of legal malpractice cannot be decided without expert proof regarding the applicable standard of care and whether the lawyer's conduct complies with this standard.

719 S.W.2d at 540. In order to give expert testimony, one must be particularly skilled or experienced in a field that is not within the scope of the common knowledge and experience of the average person. *Kinley*

*v. Tennessee State Mut. Ins. Co.*, 620 S.W.2d 79 (Tenn.1981).

At trial Mehler presented two expert witnesses: Monroe Freedman, a professor of law at Hofstra University in New York, and Joe Walker, a general practitioner in Harriman, Tennessee. Professor Freedman was qualified as a national expert in lawyers' ethics. Professor Freedman based his opinion that Stone & Hinds had fallen below the standard of care expected of lawyers in Tennessee upon his testimony that the Code is the standard of care. On direct examination Professor Freedman responded affirmatively to the question, "Then, would it also be true that, *in violating these canons*, the lawyers of Stone & Hinds in the law firm and the members of that law firm have fallen below the standards of care expected of lawyers within the State of Tennessee in this conduct?" (Emphasis added.) Professor Freedman was not asked if he were familiar with the practice of law in the area including Knoxville. Nor was he asked to distinguish between the standards by which lawyers are judged depending upon the nature of the proceeding. Professor Freedman's testimony established no standard, other than the Code, with regard to Stone & Hinds representation in this case.

■ Stone & Hinds insists the plaintiff's second expert witness, Mr. Walker, was not qualified to testify as an expert witness in this case. Walker acknowledged that he was not familiar with corporate practice in the Knoxville area; he claimed general familiarity with the Code but was not able to state accurately the difference between an Ethical Consideration and a Disciplinary Rule; he had read no decision of a Tennessee court regarding legal malpractice or any ethical opinion issued by the Board of Professional Responsibility. According to Walker's testimony, his opinion was based substantially upon his belief that Mehler, as a major shareholder, had the authority to terminate counsel's employment by the corporation and that Lazy Seven was not entitled to Stone & Hinds' loyalty, as if "we had been dealing with, say, General Motors." Since the qualification of Walker as

an expert was largely within the discretion of the trial court, *Shelby County v. Barden,* 527 S.W.2d 124 (Tenn.1975), the Court will defer to the trial court's finding.

After a cursory direct examination with regard to his qualifications and his examination of the transactions on which the alleged malpractice is based, Mr. Walker was asked if in his opinion Stone & Hinds' conduct "[fell] below the minimum standard of care of lawyers practicing in the East Tennessee area." Counsel for Stone & Hinds objected on the ground that there had been no proof of the standard. Whereupon, counsel for Mehler stated:

I believe that we have established through Mr. Walker the following: That he is familiar with the Canons; he knows the disciplinary rules; *he knows that they create the minimum standards for attorneys in the East Tennessee area.* If I further tie my hypothetical question into the Canons and the disciplinary rules, then I believe certainly that disposes of any possible objections Mr. Lowe may have. (Emphasis added.)

The question was restated with the permission of the court, as follows:

All right, let me have you make those assumptions and I ask you if in your opinion the firm of Stone & Hinds and the individual members *have violated the canons and the disciplinary rules and in so doing have fallen below the minimum standard* of care expected of attorneys in the East Tennessee area? (Emphasis added.)

Over renewed objection Mr. Walker answered, "Yes, sir." Mr. Walker's testimony set forth only the Code as a standard.

■ Since the Code does not set the standard of care upon which an action for negligence can be based, expert testimony that a lawyer violated provisions of the Code is not sufficient evidence to present an issue of fact for the jury. Such testimony is not evidence of the degree of knowledge, skill, prudence, and diligence which is commonly possessed and exercised by lawyers practicing with regard to the same subject matter in that jurisdiction. The testimony of Professor Freedman and Mr.

Walker did not establish the proper standard of care required in an action for professional malpractice. The Court of Appeals properly granted the appellee's motion for directed verdict on this ground.

*Causation*

■ Stone & Hinds insists the trial court erred in refusing to direct a verdict for it on the ground that there is no material evidence that any damage sustained by Mehler was proximately caused by the conduct of Stone & Hinds. The rule, stated by the Court of Appeals in *Stricklan v. Koella,* 546 S.W.2d at 810, is that "in all negligence cases, whether they be automobile related or medical or legal malpractice related, before a recovery can be had, the nexus between the negligence and the injury must be shown." *Id.* at 813. Review of the evidence indeed shows that Mehler failed to prove any causal connection between the lawyers' conduct claimed to be negligent and the alleged damages.

Mehler insists that the proximate cause of his damages was the preparation of the Mehler family voting trust agreement, drafts of the other instruments related to the organization and operation of the corporation, and the subsequent representation of Lazy Seven in the controversy between the corporation and Mehler. This argument not only is unpersuasive, it ignores the significant distinction between multiple and successive representations.

Stone & Hinds simultaneously represented both the corporation and the individual parties connected with the organization of the corporation. Such multiple representation, however, was not in itself impermissible, even under the Code. With regard to multiple representation, DR 5–105(C) provides:

(C) In the situations covered by DR 5–105(A) and (B) [simultaneous representation of "differing interests"], a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representa-

tion on the exercise of his independent professional judgment on behalf of each.

Circumstances like those of this case, as they relate to the representation of Lazy Seven, Cox, and Mehler in the preparation of the related instruments, also are addressed in EC 5–15, as follows:

If a lawyer is requested to undertake or continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment.... On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involved in litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of his clients.

There is no material evidence in the record to support a jury determination that the judgment of the Stone & Hinds lawyers was impaired or their loyalty divided. The preparation and execution of all the instruments were for the benefit of all the parties: the corporation, its president, and the shareholders. At the time Stone & Hinds was requested to prepare the bylaws, shareholder's agreement, and the president's employment contract, it was counsel for Lazy Seven and owed its first duty to the corporation, rather than to Mehler. Though the parties perhaps had "potentially differing interests," Lazy Seven, as Stone & Hinds' original client, had an interest in all of the instruments being prepared properly and in being executed. Ethical Consideration 5–18 discusses the duty of a lawyer to a corporate client as follows:

A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

■ Mehler claims that Stone & Hinds breached its duty in not advising him of the *possible* effect of the multiple representation. The requirement of DR 5–105(C) that the lawyer must advise all clients of the "possible effect" of such representation imposes a duty that is determined by the knowledge and experience of the respective clients, the nature of the subject matter and all other relevant circumstances. The record shows that Mehler was an experienced and knowledgeable businessman who was well acquainted with the business and legal matters relating to the instruments prepared by Stone & Hinds. Mehler fails to state any actual advice that was neglected or how he was prejudiced by such neglect.

The record contains no material evidence that the preparation of the instruments to which Mehler was a party and which were incidental to the organization of this closely held corporation was the proximate cause of the damages alleged by Mehler. There is no evidence of demonstrated conflicts or potential conflicts not expressly or implicitly waived that would prohibit the simultaneous representation of the corporation and the parties involved in its organization.

In asserting that conflicts existed in Stone & Hinds' continued representation of the corporation, Mehler does not claim that Stone & Hinds' lawyers neglected their duty to *Lazy Seven;* he does not claim their representation, as it related to their corporate client, was deficient in any manner. The only construction that can be placed on Mehler's response to the insistence that there is no evidence of any connection between the conduct of Stone &

Hinds and the alleged damages is that by persistently and diligently representing Lazy Seven in opposition to Mehler's efforts to take control of the corporation Stone & Hinds violated Mehler's rights. In his argument on this issue, Mehler merely recites the legal proceedings between the corporation and him and states, "This evidence clearly establishes that the misconduct of Stone & Hinds caused the demise of Lazy Seven, and the resulting damages." The proceedings do not amount to evidence of causation. Contrarily, the evidence, without exception, shows that Mehler's own conduct was the cause of Lazy Seven's demise. He insists, unabashedly, that his efforts, including the filing of a petition for the appointment of a receiver which made it impossible for the corporation to continue to do business, was for the purpose of asserting his personal interest rather than the interest of Lazy Seven. Mehler's complaint throughout the case, unreasonable as it seems, has been that Stone & Hinds was persistently loyal to Lazy Seven rather than to him. There is no evidence that "but for" the conduct of Stone & Hinds the corporation would have survived and continued in business. *See Gay & Taylor, Inc. v. American Casualty Co.*, 381 S.W.2d 304 (Tenn.App.1963). Mehler's argument misapprehends the lawyers' duty and negates any finding of causal connection between their conduct and the alleged damages. There is no material evidence in the record that the representation of Stone & Hinds in the subsequent controversy between the corporation and Mehler was the proximate cause of Mehler's alleged damages.

Mehler further asserts that Stone & Hinds' representation of a sales employee of Lazy Seven in the dissolution proceedings was the proximate cause of his alleged damages. After the corporation had been placed in receivership, Stone & Hinds filed on behalf of a former employee of Lazy Seven a claim against the receiver, and ultimately against Mehler, for commissions due on sales made on behalf of the corporation prior to the appointment of the receiver. The president of Lazy Seven consented to the representation because, in his opin-

ion, the employee was entitled to the commission. Mehler admitted that Stone & Hinds received from Mehler no confidential information or any information which could be used to Mehler's prejudice in the subsequent litigation. There is no evidence in the record that the representation of the sales employee caused the demise of the corporation and Mehler's claimed damages.

Mehler, relying upon testimony of Professor Freedman, asserts that proof of actual causation is not necessary. He insists that proof of a substantial relationship between the subject matters of a prior representation and a subsequent representation creates a conclusive presumption that the lawyers acquired confidential information in the prior representation which could be used to the former client's prejudice in the subsequent representation.

Whether the record establishes that the subject matters of the prior and subsequent representations in this case were substantially related need not be resolved, because its only function is to establish the presumption of shared confidences in the absence of proof. The proof in this case, including the testimony of Mr. Mehler, is that Stone & Hinds acquired no "confidence or secret" during the preparation of the Mehler family voting trust agreement and the other instruments and that no information was acquired by Stone & Hinds which could have been used to Mehler's disadvantage in the subsequent litigation.

Nevertheless, Professor Freedman was asked to assume, for the purpose of a hypothetical question, that there was a substantial relationship between the information obtained by Stone & Hinds for the preparation of the instruments related to the organization and operation of the corporation and the issues in the subsequent litigation between the corporation and Mehler. Professor Freedman, for the purpose of the question, relied upon a "conclusive presumption" that confidential information was revealed by Mehler to Stone & Hinds, to conclude that the law firm violated the Code's requirement that a lawyer preserve the confidences and secrets of his client, and that, therefore, Stone & Hinds is liable.

That there were, *in fact*, no confidences or secrets revealed by Mehler to Stone & Hinds, Professor Freedman considered irrelevant. Freedman explained as follows:

> [T]he conflict of interest notion itself is appearance of impropriety. You are not saying—when you talk about a conflict of interest or you're talking about an appearance of impropriety, you are not saying we know that this lawyer, in fact, did something wrong. What you are saying is it looks bad. And even though the lawyer may not have done anything wrong, in fact, even though we assume the lawyer did not do anything wrong, we are not going to permit it to look that way.

■ Professor Freedman's conclusion that there need be no proof of causation to establish civil liability cannot be accepted. His rationale itself demonstrates why the Code cannot be the standard. Even though the appearance of impropriety may be the basis for disciplinary proceedings against the lawyer, and perhaps the basis for disqualification in a legal proceeding, it cannot be the basis for civil liability without proof of a causal connection between a lawyer's conduct and any claimed damages. The lawyer, to use Freedman's words, "who did not do anything wrong" cannot be held liable only because "it looks bad," and the conclusive presumption of shared confidences cannot be substituted for a causal connection between the acts of the lawyer and the alleged damages. The necessary proof of causation between Stone & Hinds' representation and the alleged damages is totally absent.

Because the record shows there were in fact no shared confidences or secrets, it is not necessary to discuss in this opinion the rights and duties that may arise upon a showing of a substantial relationship between the subject matters of successive representations in the absence of proof regarding shared confidences. Such rights and duties will be determined by the circumstances of the representation and by the nature of the proceedings, such as disciplinary actions, motions for disqualifica- tion in pending litigation, and civil actions for malpractice.

*Waiver*

The Court of Appeals found that Mehler's admitted failure to move for the disqualification of Stone & Hinds as counsel for Lazy Seven at the first opportunity constituted a waiver of any claim based on conflict of interests and held, "when a party has full knowledge of the facts giving rise to a conflict of interest, that party must move for the disqualification of the attorney or waive any tort claim against the attorney arising out of such conflict." The Court of Appeals acknowledged that the cases relied upon involved motions to disqualify lawyers in pending litigation but found "the rationale is equally applicable to an action for legal malpractice premised on conflict of interest." Though the record supports the Court of Appeals' finding that Mehler's failure to object to the continued representation of Lazy Seven operated as a waiver, the court's statement of the rule is too broad to be applicable in all situations.

■ In cases involving successive representations, a party is required to move that his former lawyer be disqualified as soon as he is aware of the conflict, provided the motion for disqualification or the granting thereof would not place the former client at an unfair disadvantage. *See Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir.1983). The client cannot hold the right in reserve for tactical purposes until it would be most helpful to his position. Failure to move for disqualification at the earliest practical opportunity will constitute a waiver. *See Central Milk Producers Cooperative v. Sentry Food Stores*, 573 F.2d 988 (8th Cir. 1978).

■ In this case, Mehler was aware that Stone & Hinds was representing Lazy Seven in the controversy between the corporation and him. The filing of the complaint seeking a temporary restraining order prohibiting Mehler from interfering further with the operation of the corporate business was ample notice. The record discloses no reason why Mehler, who was

represented by counsel, could not have moved for the disqualification of Stone & Hinds without prejudice to his rights. Upon motion, the court could have heard proof and determined if Stone & Hinds should be disqualified. Mehler's failure to move for disqualification therefore constituted a waiver of any claim based on conflict of interests.

Other states have held similarly. For instance, in *Lau v. Valu–Bilt Homes Ltd.*, 59 Haw. 283, 582 P.2d 195 (1978), one member of a joint venture brought an action for contribution against his fellow joint venturers and in doing so was represented by an attorney who had previously represented both plaintiff and defendants for a short period of time in a related matter. The trial court denied defendants' motion to disqualify plaintiff's counsel. In affirming that order, the Supreme Court of Hawaii found that both defendants and their counsel had known of the apparent conflict from the time suit was commenced but had not filed a motion to disqualify plaintiff's attorney until more than one year after the complaint was filed and less than 48 hours before trial. The court also found, as in the case before this Court, there was no evidence the lawyer had received any confidential information from the defendants during the time he represented them. The court acknowledged the general rules forbidding counsel from representing interests adverse to a former client but went on to write:

> However, in the absence of evidence of actual prejudice, one, who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly in order to reserve it for the most expedient time, may be deemed to have waived that right.

*Id.* at 204; *accord, Redd v. Shell Oil*, 518 F.2d 311 (10th Cir.1975).

The same considerations apply in this case. Mehler admitted at trial that his attorney and he took no steps to disqualify Stone & Hinds from its representation of the corporation. Had there been a conflict of interests, Mehler's failure to raise the issue would have created a reasonable belief on the part of Stone & Hinds that its continued representation of the corporation was acceptable to Mehler. *See generally* 7 Am.Jur.2d *Attorneys at Law* § 187 (1980); *see also Roth v. Roth*, 84 Ill.App.3d 240, 39 Ill.Dec. 872, 876, 405 N.E.2d 851, 855 (1980).

The Court of Appeals properly held that Mehler, by his failure to move for disqualification, waived any claim based on conflict of interests in the successive representation.

### Conclusion

The judgment of the Court of Appeals dismissing the complaint is affirmed. The costs are taxed to the appellant.

DROWOTA, O'BRIEN, DAUGHTREY, and ANDERSON, JJ., concur.