IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 4, 2000 Session

## JOHN M. CLINARD, ET AL. v. C. ROGER BLACKWOOD, ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Robertson County**
**No. 8674     Walter C. Kurtz, Judge**

_____

**No. M1998-00555-SC-R11-CV - Filed May 18, 2001**

_____

We granted this appeal to determine whether attorney screening procedures may be used to prevent a law firm's disqualification under Tenn. Sup. Ct. R. 8, Canon 5, DR 5-105(D), the vicarious disqualification rule. We hold that when an attorney has a conflict of interest arising from a former representation that would prohibit representation of a present client, DR 5-105(D) does not require automatic vicarious disqualification of that attorney's law firm. When an attorney has a conflict of interest resulting from former representation, adequate procedures to screen that attorney can rebut the presumption of shared confidences. The screening procedures utilized in this case were sufficient to overcome the presumption of shared confidences. Nevertheless, the serious appearance of impropriety requires the law firm's disqualification. The judgment of the Court of Appeals is affirmed.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed.**

JANICE M. HOLDER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and Adolpho A. Birch, Jr., joined. FRANK F. DROWOTA, III, J., filed a concurring and dissenting opinion. WILLIAM M. BARKER, filed a concurring opinion.

Ames Davis, Mark W. Peters, Paula D. Walker, and Thomas Mink, Nashville, Tennessee, for the appellant, American Limestone, Inc.

Ames Davis, Mark W. Peters, and Paula D. Walker, Nashville, Tennessee, for the appellants, Edward Clinard and John M. Clinard.

James Clarence Evans and Winston S. Evans, Nashville, Tennessee, for the appellees, C. Roger Blackwood and Nancy Dods Blackwood.

Thomas Mink, Nashville, Tennessee, for the defendant, Austin Powder Co., Inc.

Allen F. Ramsaur, Gail Vaughn Ashworth, and Kathryn Reed Edge, Nashville, Tennessee, and Brian S. Faughnan and Lucian T. Pera, Memphis, Tennessee, for the amicus curiae, Tennessee Bar Association.

## OPINION

### BACKGROUND

Maclin P. Davis, Jr., was a partner in the law firm of Waller, Lansden, Dortch & Davis ("the Waller firm"). While at the Waller firm, Mr. Davis represented both Mr. C. Roger Blackwood and Mrs. Nancy Dods Blackwood in separate matters. In 1988, Mr. Davis left the Waller firm and joined the law firm of Baker, Donelson, Bearman & Caldwell ("the Baker firm").[1] Mr. Davis continued to represent the Blackwoods during his employment with the Baker firm.

John and Edward Clinard filed a declaratory judgment action against Mr. Blackwood seeking to establish a disputed property line. Mr. Blackwood retained Mr. Davis to represent him in the lawsuit. Mr. Davis entered an appearance and filed an answer and counterclaim against the Clinards. Mr. Davis and Mr. Blackwood also discussed filing a counterclaim and third-party claim against the Clinards and American Limestone Company, Inc. for blasting damage to the Blackwoods' property. Ultimately, Mr. Davis withdrew as Mr. Blackwood's attorney because American Limestone was a client of the Baker firm in an unrelated matter.

Attorney Winston S. Evans was then hired to represent the Blackwoods. Mr. Evans filed an amended counterclaim and third-party claim on behalf of the Blackwoods against the Clinards and American Limestone and later added Austin Powder Company, Inc. as a counterdefendant.[2]

Subsequently, the Waller firm undertook representation of the Clinards and American Limestone against the Blackwoods. In June 1997, Mr. Davis left the Baker firm and returned to the Waller firm. Upon Mr. Davis's return, the Waller firm implemented its "Conflict of Interest Screening Procedures." These procedures were intended to prevent Mr. Davis and his secretary from sharing information concerning the Blackwoods' case with the other lawyers and staff of the Waller firm.

In September 1997, the Blackwoods filed a motion to disqualify the Waller firm from continuing to represent the Clinards. The trial court ruled that the Waller firm was not disqualified. The Blackwoods were granted an interlocutory appeal.

---

[1] The firm was then known as Heiskell, Donelson, Bearman, Adams, Williams & Kirsch.

[2] Austin Powder Company, Inc., was subcontracted by American Limestone Company, Inc. to conduct the blasting that allegedly caused damage to the Blackwoods' property.

The Court of Appeals reversed. In a comprehensive examination of relevant authorities, the court ruled that the screening procedures employed by the Waller firm were insufficient to rebut the presumption of shared confidences between Mr. Davis and the members of the Waller firm with regard to the Blackwood/Clinard litigation. We granted review.

## STANDARD OF REVIEW

A trial court's ruling on attorney disqualification, or the vicarious disqualification of that attorney's firm, will be reversed only upon a showing of an abuse of discretion. State v. Culbreath, 30 S.W.3d 309, 312-13 (Tenn. 2000); accord State v. Tate, 925 S.W.2d 548, 550 (Tenn. Crim. App.1995); Whalley Dev. Corp. v. First Citizens Bancshares, Inc., 834 S.W.2d 328, 331-32 (Tenn. Ct. App. 1992). A trial court abuses its discretion whenever it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

This Court, however, occupies a unique position to administer the ethical conduct of Tennessee attorneys. "It is well settled that the licensing and regulation of attorneys practicing law in courts of Tennessee is squarely within the inherent authority of the judicial branch of government." Smith County Educ. Ass'n v. Anderson, 676 S.W.2d 328, 333 (Tenn. 1984). Pursuant to our inherent authority, we govern the discipline of attorneys in this state, Swafford v. Harris, 967 S.W.2d 319, 321 (Tenn. 1998), and are responsible for "prescribing and seeking to enforce and uphold the standards of professional responsibility." Petition of Tenn. Bar Ass'n, 539 S.W.2d 805, 810 (Tenn. 1976) (Harbison, J., concurring). Furthermore, this Court has "original and exclusive jurisdiction to promulgate [our] own Rules. [Our] rule making authority embraces the admission and supervision of members of the Bar of the State of Tennessee." Id. at 807.

As the above authorities suggest, this Court owes a special obligation to ensure proper application of our rules and administration of the legal profession. Our review of a lower court's interpretation of the ethical rules promulgated by this Court is plenary. See In re Burson, 909 S.W.2d 768, 774 (Tenn. 1995); Belmont v. Bd. of Law Examiners, 511 S.W.2d 461, 462 (Tenn. 1974); Anderson, 676 S.W.2d at 333-34. Accordingly, we will closely scrutinize a trial court's disqualification of an attorney or that attorney's firm for an abuse of discretion arising from improper interpretation or application of our rules. Accord Cheves v. Williams, 993 P.2d 191, 205 (Utah 1999) ("The proper standard of review for decisions relating to disqualification is abuse of discretion. However, to the extent this Court has a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited.").

## ANALYSIS

This case involves the "delicate and sometimes difficult task of balancing competing interests: the individual right to be represented by counsel of one's choice, each party's right to be free from the risk of even inadvertent disclosure of confidential information, and the public's interest

in the scrupulous administration of justice." Brown v. Eighth Judicial Dist. Court, 14 P.3d 1266, 1269-70 (Nev. 2000). Attorney professional mobility is also implicated in this case and is of special concern to us in our capacity as the ultimate regulator of the Tennessee bar. See In re Burson, 909 S.W.2d 768 (Tenn. 1995).

This Court has promulgated disciplinary rules regulating the ethical conduct of Tennessee attorneys as part of the Tennessee Code of Professional Responsibility. Tenn. Sup. Ct. R. 8. "The Disciplinary Rules . . . are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Code of Prof'l Resp., Preliminary Statement. Disciplinary Rule 5-105(D), part of Canon 5 of the Tennessee Code of Professional Responsibility, states as follows:

> If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule no partner, or associate, or any other lawyer affiliated with that lawyer or that lawyer's firm, may accept or continue such employment.

This rule provides for the vicarious disqualification of an attorney's firm when that attorney would be prohibited by the Disciplinary Rules from undertaking the representation. It is undisputed that Mr. Davis would himself be prohibited from representing the Clinards in this matter because of a conflict of interest. Accordingly, under strict application of DR 5-105(D), the Waller firm would be disqualified from representing the Clinards because of Mr. Davis's prior representation of the Blackwoods. Disqualification is necessary because Mr. Davis is presumed to have shared the Blackwoods' confidences with the Waller firm. See Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C., 813 S.W.2d 400, 409 (Tenn. 1991). The Waller firm contends, however, that DR 5-105(D) does not prohibit its representation of the Clinards because the firm took adequate measures to screen[3] Mr. Davis and his secretary from any involvement with the Clinard/American Limestone matter.

There is no express "screening" exception to be found anywhere in this Court's rules governing attorney conduct. Nevertheless, the Board of Professional Responsibility of the Tennessee Supreme Court ("Board")[4] has endorsed the use of screening procedures. Over ten years ago, in Formal Opinion 89-F-118, 1989 WL 534365 (March 10, 1989), the Board "approve[d] the use of screening procedures as a viable method to avoid the imputed or vicarious disqualification provisions of DR 5-105(D)."

The Board held that "both the presumption that an attorney has acquired confidences from a former client or from his or her former firm's client and the presumption that the attorney has

---

[3] Mechanisms to insulate attorneys in order to prevent the spread of confidences learned during a prior representation are traditionally referred to as "Chinese Walls." See Black's Law Dictionary 240 (6th ed. 1990).

[4] The Board of Professional Responsibility, an agency of this Court, is responsible for issuing ethics opinions. Tenn. R. Sup. Ct. 9 § 26.1. Formal Opinions issued by the Board "constitute a body of principles and objectives upon which members of the bar can rely for guidance in many specific situations." Id. § 26.5(a).

shared those confidences with the attorneys in his or her new firm are rebuttable." This Court also has indicated that adequate screening measures may suffice to prevent vicarious disqualification under DR 5-105(D). See Culbreath, 30 S.W.3d at 317 (disqualifying entire District Attorney General's office in part because there were "no efforts to screen [the conflicted prosecutor] from other members of the District Attorney General's office.").

In these days of monolithic law firms and increased opportunity and mobility for both clients and attorneys,[5] a per se rule of vicarious disqualification is not feasible. When screens can eliminate the sharing of confidences, a client's right to counsel of choice should be preserved. Accordingly, we adopt Formal Opinion 89-F-118 as an exception to the DR 5-105(D) rule of vicarious disqualification.[6] This exception shall be applicable on a case-by-case basis to attorneys, law clerks, paralegals, and legal secretaries.

Under Formal Opinion 89-F-118, a three-step analysis adopted from Schiessle v. Stephens, 717 F.2d 417, 420-21 (7th Cir. 1983), is used to determine whether an attorney's prior representation mandates vicarious disqualification:

> 1) whether a substantial relationship exists between the subject matter of the former and present representations.
>
> 2) whether the presumption of shared confidences which arises from its determination that the representations are substantially related has been rebutted with respect to the former representation.
>
> 3) whether the presumption of shared confidences has been rebutted with respect to the present representation.

Tenn. Bd. of Prof'l Resp., Formal Op. 89-F-118, 1989 WL 534365, *3 (1989). A relationship is substantial when "the subsequent representation is adverse to the matters at issue in the previous relationship" or when "the lawyer was so involved in the matter that the subject representation can be justly regarded as a changing of sides in the matter in question." Id. Once a substantial relationship is found, the court should determine whether the evidence rebuts the presumption of shared confidences between the attorney and the initial client in the former representation. If that

---

[5] See generally, James F. Fitzpatrick, Legal Future Shock: The Role of Large Law Firms by the End of the Century, 64 Ind. L. J. 461 (1989); James W. Jones, The Challenge of Change: The Practice of Law in the Year 2000, 41 Vand. L. Rev. 677 (1988).

[6] The Tennessee Bar Association has proposed rules specifically authorizing the use of screens. See Proposed Rule 1.10(B), Tennessee Bar Ass'n Comm. for the Study of Standards of Prof'l Conduct (Nov. 1, 1997), reprinted in 957 S.W.2d No. 3 (Feb. 17, 1998). Proposed Rules 1.10(B) and (D) are "intended to codify Tennessee Formal Ethics Opinion 89-F-118." Id. at comm. n 2.

presumption is not rebutted, the court must consider whether the evidence rebuts the presumption of shared confidences between the attorney and the new firm in the present representation. It is at this point that screening procedures are implicated.

Courts should consider the following non-exclusive list of factors to determine "whether the screening mechanisms reduce to an acceptable level the potential for prejudicial misuse of client confidences" such that the presumption of shared confidences is rebutted:

1) the structural organization of the law firm or office involved,

2) the likelihood of contact between the "infected" person and the specific attorneys and support personnel involved in the present representation,

3) the existence of law firm or office rules which prevent the "infected" person

  a) from access to relevant files or other information pertaining to the present litigation and

  b) from sharing in the fees derived from such litigation.

Id. Evidence supporting these factors must be "objective and verifiable." Id.

In this case, there is no question that there was a substantial relationship between Mr. Davis's former representation of the Blackwoods and his firm's present representation of the Clinards. A presumption of shared confidences, therefore, arises in this case. There is also no dispute that the Blackwoods actually shared confidential information with Mr. Davis during the prior representation. Therefore, the presumption of shared confidences in the former representation has not been rebutted. Accordingly, this case turns on whether the presumption of shared confidences has been rebutted with respect to the present representation.

Based upon the factors laid out above, the following undisputed evidence is relevant to the question of whether the presumption of shared confidences has been rebutted with respect to the present representation of the Clinards and American Limestone. The Waller firm is comprised of one hundred attorneys. Since 1989, the Waller firm has had a written policy entitled "Conflict of Interest Screening Procedures." The screening policy provides as follows when a conflict of interest is detected in regard to a newly hired attorney:

(a)    the Managing Partner will compile a list of all matters where a potential conflict exists because of previous employment;

(b)    all attorneys, summer associates, paralegals, and legal secretaries will be instructed in writing not to discuss the specified matter or matters with, or in

the presence of, the newly hired individual or to permit such individual to have access to any files pertaining to such matters;

(c)     all attorneys, summer associates, paralegals, and legal secretaries will be instructed in writing to place brightly colored labels on all files pertaining to the specific client or matter which will state the following: "The person listed below is not allowed to access this file and no discussions should be had with or around this person regarding this case. This is in accordance with Ethics Opinion 89-F-118 of the Tennessee Board of Professional Responsibility. (Individual's name)";

(d)     all attorneys in the Firm will be advised that no reference shall be made to the case or matters in the Firm's daily newsletter;

(e)     the newly hired attorney . . . shall, if possible, be located on a different floor or on a different part of the floor, than the attorneys, paralegals and secretaries involved in the case(s) under question; and

(f)     the Managing Partner will fully inform any affected client of the conflict in writing before the new employee reports to work.

The record contains memoranda circulated throughout the Waller firm showing that the screening policy was implemented in anticipation of Mr. Davis's hire. A memorandum dated June 16, 1997, forbids Mr. Davis and his legal secretary, Martha Nicholson, from "engaging in any work, having any discussions, gathering any information and being involved in any way with" the Clinard/American Limestone matter. Both Mr. Davis and Ms. Nicholson testified that they have fully complied with this memorandum and have not discussed anything regarding the Blackwoods or this litigation with any person at the Waller firm.

Mr. Davis was a non-equity member of the firm and therefore did not share in any fees from the Clinard/Blackwood matter. Only three Waller firm attorneys participated in the Clinard/Blackwood matter. Although Mr. Davis's office was located on the same floor of the offices of these attorneys, his office was separated by at least three offices from any of their offices. All three attorneys testified that they had no communications with Mr. Davis or Ms. Nicholson regarding the Clinard/Blackwood matter. There was no evidence of any actual sharing of confidences.

We conclude from this evidence that the presumption of shared confidences was adequately rebutted in this case. Mr. Davis's and Ms. Nicholson's contentions that they shared none of the Blackwoods' confidences with any member of the Waller firm is supported by the objective and verifiable evidence that the Waller firm implemented a long-adopted screening policy to prevent Mr. Davis and Ms. Nicholson from accessing or communicating any information regarding the Clinard/Blackwood matter. Accordingly, there has been no violation of DR-5-105(D).

<u>The Appearance of Impropriety</u>

There are additional ethical rules implicated by this case, however. Ethical Consideration 9-6 of Canon 9 of the Tennessee Code of Professional Responsibility states,

> Every lawyer owes a solemn duty . . . to avoid not only professional impropriety but also the appearance of impropriety.

<u>See also</u> Tenn. Code of Prof'l Resp., Canon 9, DR 9-101. While the Ethical Considerations are only "aspirational in character," Tenn. Code of Prof'l Resp., Preliminary Statement, an attorney's avoidance of the appearance of impropriety is essential to the integrity of the legal profession. "[T]he mere appearance of impropriety is just as egregious as any actual or real conflict." <u>Lovell v. Winchester</u>, 941 S.W.2d 466, 469 (Ky. 1997); <u>cf.</u> <u>Davis v. Liberty Mut. Ins. Co.</u>, 38 S.W.3d 560, 565 (Tenn. 2001) ("the appearance of bias is as injurious to the integrity of the judicial system as actual bias"). The Board's reference to the appearance of impropriety standard in Formal Opinion 89-F-118 speaks to its continued relevance to vicarious disqualification even when adequate screening measures have been employed. Formal Op. 89-F-118 at *4 ("Protection of the image of the profession from 'even the appearance of impropriety' (DR 9-101) is also vitally important.").

The appearance of impropriety standard has been criticized. The American Bar Association's Model Rules of Professional Conduct, now adopted in some form by most jurisdictions, patently rejects the standard:

> First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since "impropriety" is undefined, the term "appearance of impropriety" is question-begging.

Model R. Prof'l Conduct 1.9 cmt. 5; <u>see also</u> Annotated Model R. Prof'l Conduct 1.10, Legal Background (noting that the "appearance of impropriety standard has been removed from the Model Rules").

In spite of this criticism, we are confident that Tennessee courts have and will continue to apply the appearance of impropriety standard as a basis for disqualification fairly and effectively.[7] Admittedly, "appearance of impropriety" evades easy definition. The standard's imprecision results more from necessity than fault, however. <u>See</u> <u>Roberts & Schaefer Co. v. San-Con, Inc.</u>, 898 F. Supp. 356, 359 (S.D. W. Va. 1995). Ethical rules must necessarily be broad and flexible so as to have

---

[7]Our adherence to the appearance of impropriety standard arises from application of the current version of the Tennessee Code of Professional Responsibility. Future revisions to the Code of Professional Responsibility may yield different results. <u>See</u> Proposed Rule 1.10 cmt. 6, Tennessee Bar Ass'n Comm. for the Study of Standards of Prof'l Conduct (Nov. 1, 1997) (rejecting appearance of impropriety standard in imputed disqualification cases), <u>reprinted in</u> 957 S.W.2d No. 3 (Feb. 17, 1998).

some application in various ethical dilemmas, see id., and the appearance of impropriety standard can work well when more specific rules may be ineffective. See Lawrence J. Fox, Litigating Conflicts: Is It Time to Revive the Appearance of Impropriety?, 9 No. 2 Prof. Law. 1 (Feb. 1998).

The appearance of impropriety standard is not amorphous. There are subtle, but identifiable, contours of the rule that aid in its application. First, the mere possibility of impropriety is insufficient to warrant disqualification. "It cannot be a fanciful, unrealistic or purely subjective suspicion of impropriety that requires disqualification. The appearance of impropriety must be real." United States v. Smith, 653 F.2d 126, 128 (4th Cir. 1981). Second, the standard is objective. Avoidance of the appearance of impropriety is intended to promote public confidence in the legal system. See, e.g., Lee v. Todd, 555 F. Supp. 628, 631 (W.D. Tenn. 1982) (appearance of impropriety standard "ensure[s] that public confidence in our legal system is not diminished"); Tate, 925 S.W.2d at 551. Therefore, objective public perception rather than the subjective and "anxious" perceptions of the litigants governs. Cf. Roberts & Schaefer Co., 898 F. Supp. at 359 (holding appearance of impropriety standard is objective test).

Third, because judges have a privileged understanding of the legal system, they may fail to find an appearance of impropriety where one would be found by a layperson. The existence of an appearance of impropriety should therefore be determined from the perspective of a reasonable layperson. See Heringer v. Haskell, 536 N.W.2d 362, 367 (N.D. 1995). Fourth, that layperson is deemed to have been informed of all of the facts, including whether and to what extent screening procedures were employed. In sum, an appearance of impropriety exists "in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." N.J. Rules of Prof. Cond. 1.7(c)(2); cf. Davis, 38 S.W.3d at 564 (holding judge should be recused when a "person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality").

In Culbreath, we held that even "[i]f there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety." Culbreath, 30 S.W.3d at 312-13. The "appearance of impropriety" is therefore an independent ground upon which disqualification may be based. Id.; see also Lazy Seven Coal Sales, Inc., 813 S.W.2d at 410 (noting "the appearance of impropriety may be the basis for disciplinary proceedings against the lawyer, and perhaps the basis for disqualification in a legal proceeding"). We recognize that disqualification of one's counsel is a drastic remedy and is ordinarily unjustifiable based solely upon an appearance of impropriety.[8] We remain convinced, however, that in a rare case, even one in which screening

---

[8] See, e.g., Bd. of Educ. of N.Y. v. Nyquist, 590 F.2d 1241, 1247 (2d Cir. 1979) (holding that the "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases"); Bergeron v. Mackler, 623 A.2d 489, 494 (Conn. 1993); Charles W. Wolfram, Former-Client Conflicts, 10 Geo. J. Legal Ethics 677 n.35 (Summer 1997) ("Almost every scholarly analysis of the 'appearance' standard has disapproved of its use as an independent basis for finding conflict."). But see State v. Loyal, 753 A.2d 1073, 1080 (N.J. 2000) ("Once an appearance of impropriety is found, 'only in extraordinary cases should a client's right to counsel of his or her choice (continued...)

procedures were used effectively, the taint of the appearance of impropriety can be purged only by disqualification.[9]  This is one such case.

This is not a case in which conflict resulted from an attorney's prior representation in a different, unrelated matter.  Mr. Davis's firm now stands as adversary against the Blackwoods in the very litigation in which Mr. Davis once represented them and gained their confidences. To analogize to baseball, Mr. Davis has not only switched teams, he has switched teams in the middle of the game after learning the signals.  That Mr. Davis has been benched by his new team does little to ameliorate the public perception of an unfair game.

The term "appearance of impropriety" may be difficult to define in isolation, but its existence is clear in this situation.  See Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263, 1269 (7th Cir. 1983).  The Blackwoods communicated confidential information to Mr. Davis in pursuit of contesting the Clinards' boundary dispute.  Having learned those confidences, Mr. Davis then allied with the opposition.  A reasonable layperson presented with the facts of this case would no doubt find a substantial risk of disservice to the Blackwoods' interest in this case, despite the use of screening procedures.  See id. ("For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public"); Heringer, 536 N.W.2d at 367 (holding "the 'person on the street' would view a law firm 'switching sides' in the middle of a dispute to be highly objectionable").[10]

It appears to the public that confiding in an attorney is sometimes a mistake.  "Clients must feel free to share confidences with their lawyers.  This will not occur if we permit lawyers to be today's confidants and tomorrow's adversaries." Penn Mut. Life Ins. Co. v. Cleveland Mall Assocs., 841 F. Supp. 815, 818 (E.D. Tenn. 1993).  Also, by permitting the Waller firm to represent the Clinards in this case, the public would be left to conclude at best that the judiciary favors

---

[8](...continued)
outweigh the need to maintain the highest standards of the profession.'").

[9]Indeed, some jurisdictions that have by rule abandoned the "appearance of impropriety" standard continue to apply it as a basis for disqualification.  See First Am. Carriers, Inc. v. Kroger Co., 787 S.W.2d 669, 671 (Ark. 1990) (holding that appearance of impropriety is independent basis for disqualification in spite of comments in rules that specifically reject that standard); Lovell v. Winchester, 941 S.W.2d 466, 468 (Ky. 1997) (same); Brown v. Eighth Judicial Dist. Court, 14 P.3d 1266, 1269 n.4 (Nev. 2000) (holding that disqualification for appearance of impropriety allowable in appropriate case in spite of Nevada's failure to adopt ethical Canon 9 regarding appearance of impropriety); cf. State Farm Mut. Auto. Ins. Co. v. K.A.W., 575 So. 2d 630, 633-34 (Fla. 1991); Heringer v. Haskell, 536 N.W.2d 362, 366 (N.D. 1995) (noting spirit of appearance of impropriety standard remains despite rules abandoning it); Burkes v. Hales, 478 N.W.2d 37, 43 (Wis. Ct. App. 1991) (same).

[10]We decline to adopt the per se rule promulgated by the concurring opinion requiring disqualification every time an attorney joins a law firm previously adversarial to that attorney in a particular case.  Rules of ethics, especially the "appearance of impropriety" standard, must be flexibly applied to allow for just resolution in every conceivable factual scenario.  We leave open the possibility that in a particular case, screening procedures may be so effective that even the appearance of impropriety has been eliminated.

considerations of attorney mobility over client confidentiality and at worst that Tennessee attorneys are free to disregard ethical considerations for sake of better employment opportunities.

The trial court's order shows that it held that the screening procedures implemented by the Waller firm rebutted the presumption of shared confidences. The order, however, makes no reference to the appearance of impropriety standard, and there is no indication in the record that the court ever considered it. Because the trial court did not consider the appearance of impropriety standard, we must find that the court abused its discretion for failure to apply an appropriate legal standard. <u>Shirley</u>, 6 S.W.3d at 247. We further find that the appearance of impropriety in this case is undiminished by the screening procedures put in place by the Waller firm. In fact, the wall built between Mr. Davis and the Waller firm may have prevented any impropriety. In appearance, however, the impropriety remains.

## CONCLUSION

We hold that when an attorney has a conflict of interest arising from a former representation that would prohibit representation of a present client, Tenn. R. Sup. Ct. 8, Canon 5, DR 5-105(D) does not require automatic vicarious disqualification of that attorney's law firm. When an attorney has a conflict of interest resulting from former representation, adequate procedures to screen that attorney can rebut the presumption of shared confidences. The screening procedures utilized in this case were sufficient to overcome the presumption of shared confidences. Nevertheless, the trial court's failure to also apply the appearance of impropriety standard constituted an abuse of discretion. We hold that the serious appearance of impropriety requires the Waller firm's disqualification. The judgment of the Court of Appeals is affirmed. Costs of this appeal are taxed to Appellants, John M. Clinard and Edward Clinard, for which execution may issue if necessary.

_____
JANICE M. HOLDER, JUSTICE