IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 31, 2002

## KELLEY SCOTT McEVOY v. KIMBERLY MARIE BREWER

**Appeal from the General Sessions Court for Sumner County**
**No. 2819-G       C.L. Rogers, Judge**

---

**No. M2001-02054-COA-R3-CV - Filed November 25, 2003**

---

This appeal involves the custody of a seven-year-old girl. Her parents initially agreed to joint custody in their marital dissolution agreement that was approved by the General Sessions Court for Sumner County. Both parties later petitioned for sole custody. The general sessions court determined that the father should be the child's primary custodial parent because the mother had married a man who posed a credible threat of domestic abuse or violence toward the child and because the existing alternating custody arrangement was no longer workable. The mother asserts on this appeal that the evidence does not support the general sessions court's decision to change custody. We have determined that the evidence does not preponderate against the court's decision to modify the custody arrangement and to award the father primary physical custody of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Dennis W. Powers, Gallatin, Tennessee, for the appellant, Kimberly Marie Brewer.

Bruce N. Oldham and Sue Hynds Dunning, Gallatin, Tennessee, for the appellee, Kelley Scott McEvoy.

### OPINION

### I.

Kimberly Marie Spears gave birth to Chelsea Lynn McEvoy in May 1996. Ms. Spears married Kelley Scott McEvoy in November 1997, and two weeks later, Mr. McEvoy adopted Chelsea Lynn McEvoy. The parties separated in early 1999 and were divorced in the Sumner County General Sessions Court[1] on October 4, 1999. Their marital dissolution agreement called for joint custody with Ms. Spears being the child's primary residential parent. The parties also agreed that

---

[1] Division II of the Sumner County General Sessions Court has concurrent jurisdiction with the circuit and chancery courts over "domestic matters." Act of Mar. 10, 1982, ch. 236, § 3, 1982 Tenn. Priv. Acts 89, 89- 90, *amended by* Act of May 11, 1989, ch. 93, § 2, 1989 Tenn. Priv. Acts 186, 186-87.

Ms. Spears would have Chelsea overnight on Mondays and Wednesdays and that Mr. McEvoy would have her overnight on Tuesdays and Thursdays. In addition, they agreed to alternate custody on weekends and holidays and that each parent would have two weeks of summer vacation.

Mr. McEvoy's work schedule is flexible because he is a self-employed locksmith. After the divorce, he married Cindy McEvoy who already had a son the same age as Chelsea. Mr. McEvoy and his new spouse later had a daughter of their own. Their marriage was not without some discord. Eventually, their heated arguments prompted them to begin marriage counseling to help them deal with the stress caused by the children, their marriage, and the custody dispute with Ms. Spears.

Ms. Spears began dating Tommy Spears after the divorce and eventually moved in with him. Mr. Spears had a severe problem with alcohol. He was intoxicated every weekend, and he became violent and abusive when he was intoxicated. He physically abused his own son, and he regularly beat Ms. Spears. On one occasion, he stabbed Ms. Spears. After Ms. Spears became pregnant with his child, Mr. Spears choked her and jumped on her stomach, causing her to eventually miscarry.

The record contains no evidence that Mr. Spears directed his violent behavior toward Chelsea. Nonetheless, Chelsea began having nightmares and episodes of uncontrollable crying and bed wetting while she was staying with Mr. McEvoy. She also began clinging to Mr. McEvoy and crying when it became time to return her to Ms. Spears. Mr. McEvoy learned about Mr. Spears's conduct when he telephoned Ms. Spears about Chelsea's behavior. On another occasion, Ms. Spears telephoned Mr. McEvoy to tearfully tell him that Mr. Spears had choked her and that she wanted to get away from him.

In April 2000, Mr. McEvoy filed a petition to modify the general sessions court's October 4, 1999 order. He sought sole custody of Chelsea because of the effect that Mr. Spears's violent conduct was having on her. Ms. Spears opposed Mr. McEvoy's petition and filed a petition of her own seeking sole custody. Following a hearing in May 2000, the court filed an order on June 5, 2000 directing Ms. Spears not to permit Chelsea to be in Mr. Spears's presence. Following this order, Ms. Spears and Mr. Spears continued to live in a house owned by Mr. Spears's grandfather. When Chelsea was staying with Ms. Spears, Mr. Spears supposedly moved in with his grandfather. However, on at least one occasion, Mr. Spears and Chelsea were observed together, and this incident prompted Mr. McEvoy to file a petition for criminal contempt. On October 6, 2000, Ms. Spears married Mr. Spears.

The general sessions court conducted a hearing on July 17, 2001, and issued an order on July 18, 2001, concluding that a material change in the parties' and the child's circumstances had occurred requiring the modification of the existing joint custody arrangement and that the child's interests would be best served by making Mr. McEvoy the primary custodial parent. The court also ordered that Chelsea could not be left alone at any time with Mr. Spears and that Mr. McEvoy had the authority to make the decisions regarding Chelsea's medical care when the parties were unable to agree on her treatment. Finally, the court imposed a five-day suspended sentence for civil contempt against Ms. Spears. Ms. Spears has appealed from this order.

## II.
### THE DECISION TO CHANGE CUSTODY

Ms. Spears first argues that the evidence preponderates against the general sessions court's decision to award Mr. McEvoy primary physical custody of Chelsea. She insists that the evidence preponderates against the court's conclusion that there had been a material change in Chelsea's circumstances and, even if there had been, Chelsea's interests would be served best by naming her the child's primary physical custodian. We have concluded that the evidence does not preponderate against the court's conclusions regarding the existence of a material change in circumstances or Chelsea's best interests.

### A.

Custody and visitation decisions are among the most important decisions that courts make. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997). Their chief purpose is to promote the child's welfare by creating an environment that promotes a nurturing relationship with both parents. *Aaby v. Strange*, 924 S.W.2d 623, 628 (Tenn. 1996).

Each parent has his or her own strengths and weaknesses, *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996), and it would be unrealistic to measure each parent against the standard of perfection. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Bush v. Bush*, 684 S.W.2d 89, 92 (Tenn. Ct. App. 1984). Therefore, custody decisions are not intended to reward parents for prior virtuous conduct or to punish them for their human frailties or past missteps. *Earls v. Earls*, 42 S.W.3d at 885; *Gaskill v. Gaskill*, 936 S.W.2d at 630. Rather, taking the parents as they presently are, the courts must pragmatically decide whether the parents, even though divorced, will be able to share the responsibilities for raising their child or, if not, which of the two parents is comparatively more fit to take on the primary parenting role.

Children thrive in stable environments. *Aaby v. Strange*, 924 S.W.2d at 627; NATIONAL INTERDISCIPLINARY COLLOQUIUM ON CHILD CUSTODY, LEGAL AND MENTAL HEALTH PERSPECTIVES ON CHILD CUSTODY LAW: A DESKBOOK FOR JUDGES § 5:1, at 51 (1998). Accordingly, the courts favor existing custody arrangements. *Taylor v. Taylor*, 849 S.W.2d 319, 332 (Tenn. 1993); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). In fact, a custody decision, once made and implemented, is considered res judicata upon the facts in existence or reasonably foreseeable when the decision was made. *Young v. Smith*, 193 Tenn. 480, 485, 246 S.W.2d 93, 95 (1952); *Steen v. Steen*, 61 S.W.3d at 327; *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998).

Despite a preference for continuing existing custody arrangements, the courts have recognized that the circumstances of children and their parents change. Accordingly, our statutes and decisions empower the courts to alter custody arrangements when intervening circumstances require modifications. Tenn. Code Ann. § 36-6-101(a)(1) (2003). Thus, courts may modify an existing custody arrangement when required by unanticipated facts or subsequently emerging conditions. *Smith v. Haase*, 521 S.W.2d 49, 50 (Tenn.1975); *Adelsperger v. Adelsperger*, 970 S.W.2d at 485. In the interests of stability in the child's life, a court should not alter an existing custody arrangement until (1) it is satisfied either that the child's circumstances have changed in a

material way since the entry of the presently operative custody decree or that a parent's circumstances have changed in a way that affects the child's well-being, (2) it has carefully compared the current fitness of the parents to be the child's custodian, and (3) it has concluded that changing the existing custody arrangement is in the child's best interests using the factors in Tenn. Code Ann. § 36-6-106(a)(1) (2001). *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002).

There are no bright line rules for determining when a change of circumstances should be deemed material enough to warrant changing an existing custody arrangement. *Cranston v. Combs*, 106 S.W.3d at 644; *Solima v. Solima*, 7 S.W.3d at 32. These decisions turn on the unique facts of each case. As a general matter, however, the following principles illuminate the inquiry. First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being.[2] Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. Fourth, the change in circumstances must affect the child's well-being in some material way. *Kendrick v. Shoemake*, 90 S.W.3d at 570. The existence of harm or possibility of harm to the child is no longer a necessary ingredient for a finding that a material change of circumstances has occurred. *Cranston v. Combs*, 106 S.W.3d at 645.

The person seeking to change an existing custody arrangement has the burden of demonstrating both that the child's circumstances have changed materially and that the best interests of the child require a change in the existing custody arrangement. *Nichols v. Nichols*, 792 S.W.2d 713, 714-15 (Tenn. 1990), *rev'd on other grounds*, *Aaby v. Strange*, 924 S.W.2d 623 (Tenn. 1996); *In re Bridges*, 63 S.W.3d 346, 348 (Tenn. Ct. App. 2001). The threshold question is whether there has been a material change in circumstances. *Cranston v. Combs*, 106 S.W.3d at 644; *Kendrick v. Shoemake*, 90 S.W.3d at 570. If the person seeking the change of custody cannot demonstrate that a material change in circumstances has occurred, the court should not re-examine the comparative fitness of the parents, *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), or engage in a "best interests of the child" analysis. Rather, in the absence of proof of a material change in circumstances, the trial court should simply decline to change custody. *Hoalcraft v. Smithson*, 19 S.W.3d at 828.

---

[2]Over the years, the Tennessee Supreme Court has consistently declined to review this court's decisions holding that the change in circumstances that will trigger a consideration of a change in custody must involve changes in the child's circumstances rather than either or both of the parents. *Steen v. Steen*, 61 S.W.3d at 327; *Hoalcraft v. Smithson*, 19 S.W.3d at 829. The Court has now decided that a change in either parent's circumstances can also trigger a change of custody if the change "affects the child's well-being." *Kendrick v. Shoemake*, 90 S.W.3d at 570. While a change in the custodial parent's circumstances necessarily affects the child, a change in the noncustodial parent's circumstances may not. Because the Court did not explicitly limit *Kendrick v. Shoemake* to changes in the custodial parent's circumstances, we must presume that the Court now envisions that changes in a noncustodial parent's circumstances can justify a change of custody if the noncustodial parent can demonstrate that the change in his or her circumstances somehow affects the child.

**B.**

We turn first to the threshold question – whether there has been a material change in the circumstances. The general sessions court's conclusion that the circumstances had, in fact, materially changed does not require an extended analysis because even the most cursory reading of the record reveals that the circumstances changed materially after the parties' divorce in 1999. That change is the home environment created when Ms. Spears entered into a relationship with and later married Mr. Spears.

Remarriage, by itself, is not the sort of change in circumstances that triggers a re-examination of an existing custody arrangement because remarriage is such a common occurrence in contemporary society that it can reasonably be anticipated when parties divorce. *Buckles v. Riggs*, 106 S.W.3d 668, 674 (Tenn. Ct. App. 2003); *Smithson v. Eatherly*, No. 01A01-9806-CV-00314, 1999 WL 548586, at *5 (Tenn. Ct. App. July 29, 1999) (No Tenn. R. App. P. 11 application filed) (pointing out that 75% of divorced persons marry again). However, changes in the home environment brought about by a later marriage may amount to a material change of circumstances if they materially affect the child or the child's parents. *Elder v. Elder*, M1998-00935-COA-R3-CV, 2001 WL 1077961, at *3 (Tenn. Ct. App. Sept. 14, 2001) (No Tenn. R. App. P. 11 application filed); *McCain v. Grim*, No. 01A01-9711-CH-00634, 1999 WL 820216, at *3 (Tenn. Ct. App. Oct. 15, 1999) (No Tenn. R. App. P. 11 application filed); *Tortorich v. Erickson*, 675 S.W.2d 190, 192 (Tenn. Ct. App. 1984).

The evidence supports the general sessions court's conclusion that Mr. Spears has a violent disposition and that he has physically abused Ms. Spears, his biological son, and a former girlfriend.[3] Ms. Spears dismisses this evidence by arguing that there is no proof that Mr. Spears has physically abused Chelsea. That may very well be true; however, the fact that Chelsea has so far been spared Mr. Spears's abuse does not mean that she had not been affected materially by being exposed to his abusive treatment of others. Being exposed to domestic violence can have an immediate and long-term effect on a child, even if the child is not a victim of the abuse.[4] The record contains evidence that Chelsea's behavior already reflects the effects of Mr. Spears's conduct. Accordingly, Ms. Spears's marriage to an abuser provides an ample basis for the general sessions court's conclusion that a material change in circumstances had occurred.

---

[3]The former girlfriend is now Mr. McEvoy's wife.

[4]*Nicholson v. Williams*, 203 F. Supp.2d 153, 197-98 (E.D.N.Y. 2002); HOWARD A. DAVIDSON, THE IMPACT OF DOMESTIC VIOLENCE ON CHILDREN: A REPORT TO THE PRESIDENT OF THE AMERICAN BAR ASSOCIATION 1 (1994) (calling children who witness domestic violence "secondary victims"); Lynne R. Kurtz, *Protecting New York's Children: An Argument for the Creation of a Rebuttable Presumption Against Awarding a Spouse Abuser Custody of a Child*, 60 Alb. L. Rev. 1345, 1350 (1997); Lois A. Weithorn, *Protecting Children From Exposure to Domestic Violence: The Use and Abuse of Child Maltreatment*, 53 Hastings L.J. 1, 4-6 (2001); Betsy M. Groves et al., *Silent Victims: Children Who Witness Violence*, 269 JAMA 262 (1993).

## C.

We have affirmed the general sessions court's conclusion that a material change in circumstances occurred after the parties' divorce in 1999. Accordingly, we must now decide whether the evidence supports the court's conclusion that Chelsea's interests would be served best by placing her in Mr. McEvoy's custody. We find that the evidence supports the court's decision to grant Mr. McEvoy custody of his daughter.

Like initial custody proceedings, the process used to determine the proper custodial placement in a change of custody proceeding entails comparing the parental fitness of the competing parents. *Placencia v. Placencia*, 3 S.W.3d 497, 503 (Tenn. Ct. App. 1999); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). This is a particularly fact-intensive process shaped by the factors in Tenn. Code Ann. § 36-6-106(a) (2001). Parental unfitness is not a prerequisite for changing custody. *Gaskill v. Gaskill*, 936 S.W.2d at 631. Once a material change of circumstances has been shown, a court may award custody to the parent who is comparatively more fit than the other to be the custodial parent.

This record contains ample evidence with regard to four specific matters that support the general sessions court's conclusion that Mr. McEvoy was comparatively more fit than Ms. Spears to be Chelsea's primary physical custodian. First, the evidence demonstrates that the existing "revolving door" custody arrangement had not worked and that it would become even more unworkable now that Chelsea was ready to begin school.[5] Second, Ms. Spears had interfered with Mr. McEvoy's efforts to obtain medical treatment and therapy for Chelsea. Third, Ms. Spears had demonstrated her inability to manage her anger and animosity toward Mr. McEvoy by being unable to control her use of derogatory remarks and profanity. Finally, Ms. Spears had married Mr. Spears despite his abusive tendencies and saw nothing harmful in exposing Chelsea to this abusive environment.

Our decision to uphold the general sessions court's decision to grant Mr. McEvoy custody should not be construed to reflect our belief that Mr. McEvoy can provide a perfect home environment for Chelsea. The evidence regarding the arguments between the McEvoys and the adolescent explorations of Chelsea and her step-brother reflects that there are pressures in their relationship as well. However, the record also demonstrates that the McEvoys have met these challenges head-on in a mature and appropriate way by seeking counseling for themselves and their children. The evidence clearly supports the conclusion that Mr. McEvoy's home environment is superior to Ms. Spears's home environment.

---

[5] We have pointed out on other occasions that this sort of custody arrangement usually proves to be unworkable with the passage of time. *Swett v. Swett*, No. M1998-00961-COA-R3-CV, 2002 WL 1389614, at *7-8 (Tenn. Ct. App. June 27, 2002) (No Tenn. R. App. P. 11 application filed).

# III.

## ADULT SUPERVISION FOR MR. SPEARS'S CONTACTS

Ms. Spears also takes issue with the provision in the July 18, 2001 order directing that "[t]he child shall not be left alone and without another adult present at any time or place with Tommy Spears." She insists that the general sessions court abused its discretion when it placed this limitation on Mr. Spears's relationship with Chelsea because "[t]here is absolutely no evidence in the record that Tommy Spears is a danger to the Child or that he is violent or abusive towards the Child." We disagree.

The "abuse of discretion" standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). Appellate courts do not have the latitude to substitute their discretion for that of the trial court. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). Thus, a trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001), and reasonable minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *State v. Scott,* 33 S.W.3d 746, 752 (Tenn. 2000). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). Accordingly, a trial court will be found to have "abused its discretion" only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

The record contains evidence that Mr. Spears has already physically abused Ms. Spears, his son, and his former girlfriend. The general sessions court was properly concerned about the effect that living in this environment was having on Chelsea and about the possibility that Mr. Spears could direct this sort of conduct at Chelsea at some point. While Ms. Spears introduced proof intended to rehabilitate Mr. Spears, the general sessions court was free to discount this evidence on credibility grounds.[6] We must defer to the trial court's factual findings because it was the trial court, not this court, that saw the witnesses and had an opportunity to assess their credibility. *Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 732 (Tenn. 2002); *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 139-40 (Tenn. Ct. App. 2003); *Parks Props. v. Maury County*, 70 S.W.3d 735, 741 (Tenn. Ct. App. 2001). The court's decision to permit Mr. Spears to have only supervised contact with Chelsea appropriately balances Chelsea's safety with Mr. Spears's opportunity to develop an appropriate relationship with his step-daughter. Of course, the court may revisit this restriction as the child ages or should circumstances change.

---

[6]In fact, the court found explicitly that Ms. Spears was not credible.

## IV.
### THE AUTHORITY TO MAKE MEDICAL DECISIONS FOR THE CHILD

Ms. Spears also insists that the evidence does not support the general sessions court's decision to empower Mr. McEvoy to make medical decisions for Chelsea if the parties cannot agree upon the proper course of treatment following "full consultation." We disagree for two reasons. First, we have already upheld the court's finding that Ms. Spears had "unreasonably resist[ed] obtaining medical care and therapy for . . . [Chelsea's] speech problem." Second, Mr. McEvoy has demonstrated that he is fully capable of making prudent decisions regarding his daughter's healthcare. Because Ms. Spears has been given a role in the decision-making process, we decline to find that the court abused its discretion by giving Mr. McEvoy the final decision-making authority.

## V.

We affirm the judgment and remand the case to the general sessions court for whatever further proceedings may be required. We also find that Mr. McEvoy is not entitled to be awarded his attorney's fees pursuant to Tenn. Code Ann. § 36-5-103(c) (2001). We tax the costs of this appeal to Kimberly Marie Spears and her surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., J.