IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 15, 2004 Session

## STATE OF TENNESSEE v. FRANKIE E. CASTEEL

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 215403 - 215405     James L. Weatherford, Judge**

---

**No. E2003-01563-CCA-R3-CD- Filed September 24, 2004**

---

Defendant was indicted on three counts of first degree murder, and a jury found Defendant guilty on all counts. On appeal, this Court reversed Defendant's convictions and remanded for a new trial because of the inappropriate admission of certain evidence and the prosecutor's reliance on the inadmissable evidence during closing argument. *State v. Frankie E. Casteel*, No. E1999-00076-CCA-R3-CD, 2001 WL 329538 (Tenn. Crim. App., Knoxville, April 5), *perm. to appeal denied* (Tenn. 2001). At the conclusion of the second trial, the jury again found Defendant guilty of three counts of first degree murder. On appeal, Defendant argues that (1) the Hamilton County District Attorney's Office should have been disqualified from prosecuting Defendant in this case; (2) the evidence is insufficient to support Defendant's convictions; (3) the trial court erred in allowing certain testimony; and (4) the trial court erred in admitting Defendant's adopted admission through Marie Hill's testimony. Following a thorough review of the record in this matter, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellant, Frankie E. Casteel.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, III, District Attorney General; C. Leland Davis, Assistant District Attorney, and Rodney C. Strong, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

Earl Smock and Kenneth Griffith were members of the same Air Force Squadron and were stationed at Ft. Walton Beach, Florida. The men, along with Mr. Griffith's wife, Paula Griffith, now Paula Kirby, drove to Hamilton County to visit their families for a few days. On Saturday afternoon, July 9, 1988, Richard Mason, Mr. Griffith's father-in-law, Mr. Griffith, and Mr. Smock set out from

Mr. Mason's house on three all terrain vehicles ("ATVs").  Mr. Smock had brought his red, blue and white ATV with him from Florida, and Mr. Mason borrowed a red Honda ATV from his neighbor, Stanley Nixon, for Mr. Griffith to ride.  Mr. Mason also owned a red Honda ATV.  The men packed a cooler with drinks, and Mr. Mason wrapped a pistol in a towel and placed the pistol in the tool box beneath the Honda's seat.  Mr. Griffith and Mr. Smock were not armed.  Mr. Smock and Mr. Griffith had brought only shorts with them on the trip, so the two men put on green flight suits for the ride in the woods.  The three men never returned.

Paula Kirby, Mr. Griffith's widow, testified that she did not become concerned about the men's absence until dusk.  Ms. Kirby said that her husband was over six feet tall, and he weighed around two hundred pounds.  Mr. Smock was heavier than her husband and two to four inches taller.  Ms. Kirby said that she had lived on Signal Mountain since she was six, and her father was very familiar with the woods surrounding their property.

Mr. Nixon said that he had lived on the mountain for sixty years and often hunted with Mr. Mason.  Mr. Nixon said that he did not know that Mr. Mason had borrowed his ATV until Ms. Mason called him on Sunday morning, July 10, to tell him that her husband had not come home the previous night.  Mr. Nixon said, however, that it was not unusual for the two men to use each other's ATV.  Mr. Nixon said that his ATV was basically the same type of ATV as Mr. Mason's.

After Ms. Mason's telephone call that Sunday morning, Mr. Nixon borrowed an ATV and began searching through the woods for the three men, but his efforts were unsuccessful.  Mr. Nixon spotted tracks on the dirt trails near Mr. Mason's house that appeared to have been made by ATVs.  He followed the tracks around Jake's Campground and on the trail leading to Helican Road.  He lost the tracks when he reached Vandergriff Road because that road was paved.

On Monday morning, Mr. Nixon joined one of the search teams along Helican Road which was a dirt road leading to a popular swimming hole known as the "blue hole."  When the search team approached the gate that blocked Helican Road, Mr. Nixon said that about a seventy-five foot strip of the road had been "manicured."  Mr. Nixon explained that it looked like someone had swept the dirt road with a pine branch.  He also noticed two places where the grass was matted down.  The search team later found blood and brain tissue in that area.

On cross-examination, Mr. Nixon clarified that the swept area of road was in front of the gate.  The matted grass spots were about sixty or seventy-five feet from the Helican Road, and Mr. Griffith's knife was found about 200 yards in front of the gate.  Mr. Nixon confirmed that nobody in the search party was wearing gloves.

Mr. Nixon said that he saw some other people camping in the woods when he first searched for the victims on Sunday, July 10.  The family was camping near Chickamauga Creek where it crosses Vandergriff Road.  Mr. Nixon said that a man was sitting on a blanket cleaning a gun while his family swam.  Mr. Nixon said that he did not ask the man for his name.

Mr. Nixon also described an altercation he and Mr. Mason had previously had with Cecil Hickman about eight months prior to Mr. Mason's death. Mr. Hickman was the caretaker of the property belonging to Cartter [sic] Patten. On the day of that incident, Mr. Nixon and Mr. Mason were hunting on what they thought was property belonging to Mr. Ault. The two men had separated when Mr. Nixon ran into Mr. Hickman and his two sons, all of whom were armed. Mr. Hickman told Mr. Nixon to get off the property. Mr. Nixon told Mr. Hickman that he did not know where Mr. Mason was and then left to retrieve his ATV. Mr. Nixon heard Mr. Hickman yell that he had spotted Mr. Mason in the woods, and then Mr. Hickman discharged his pistol three times in the air.

In a separate incident, Mr. Nixon and Mr. Mason spotted Mr. Hickman by the side of the road, and Mr. Mason swerved his car toward him. Mr. Hickman shook his pistol at the two men as they drove away. Mr. Nixon, however, denied that there were any hard feelings between the three men. On redirect, Mr. Nixon said that the first incident did not occur anywhere near Helican Road. Mr. Nixon said that Mr. Hickman was in Kentucky during the weekend of July 9, 1988.

Lee Griffith said that his brother, Kenneth Griffith, went up Signal Mountain on Saturday, July 9, around 3:00 p.m. Mr. Griffith later heard on a television newscast that his brother was missing, and he went over to the Masons' house. While he was at Mr. Mason's house, Mr. Griffith said that the police received a call that three ATVs had been discovered in an illegal dump on Roberts Mill Road. Mr. Griffith followed the police to the dump site and then started home to tell his mother the latest news. The engine of his truck died, however, on the way up Roberts Mill Road, and Mr. Griffith flagged down a Jeep Scrambler driven by Defendant. According to the photograph of Defendant's Jeep that was introduced at trial, the vehicle's front end resembled a standard Jeep Wrangler, and the rear was open like a pick-up truck. Defendant gave Mr. Griffith a ride back to Mr. Mason's house. Mr. Griffith stood behind Defendant as they drove, and he noticed that the wood slats in the Jeep's bed were wet. Mr. Griffith said that he thought that was odd at the time because it had not recently rained.

On Monday, Lee Griffith joined the search party on Helican Road. He said that the group took a rest break near the gate on Helican Road. A member of the team spotted some blood drops on a leaf near the gate. Helican Road was a dirt road, and Mr. Griffith said that the area around the gate was smooth so that they could not tell whether anyone had walked or driven an ATV through the gate. Mr. Griffith identified a knife found by one of the search team as belonging to his missing brother, Kenneth Griffith.

On cross-examination, Lee Griffith admitted that the police were not there when he first arrived at the dump site on Roberts Mill Road. After he got to the dump site, some people climbed up from the spot where the three ATVs lay.

Larry Sneed, a detective with the Hamilton County Sheriff's Department, responded to the call on July 10 that three ATVs had been found on Roberts Mill Road. The side of the hill leading to the dump site sloped down from the road at about a forty-five degree angle. A red, white and blue ATV was found approximately 200 feet below the road. One of the red ATVs was discovered about

150 feet down the hillside, and the second red ATV was found approximately 60 to 65 feet below the road. There was blood on both of the red ATVs which was later determined to be human blood. The blood on one of the red ATVs ran from the seat onto the tank which indicated that the ATV was parked when the injury causing the bleeding occurred. No blood was found on the red, white and blue ATV. Detective Sneed said that Defendant would have used Roberts Mill Road to get from his house to his campground on Helican Road.

Detective Sneed said that the ATVs were operable when they were tested. One of the red ATVs was running when it was pushed over the bluff because the ignition was in the "on" position, and the exhaust pipe had burned a section of the plastic fender. One ATV at a time could fit into the back of Defendant's Jeep, but it took two men to lift the ATV into the Jeep.

Detective Sneed said that they set up a command center on Monday, July 11, about three miles from the dump site on Roberts Mill Road. The police learned that shots had been heard on Saturday evening in the Helican Road area. Detective Sneed said that a search team walked from Vandergriff Road approximately 2.2 miles down Helican Road until they reached the gate. When the team stopped for a break, Detective Sneed noticed a spot of blood on a leaf. He also observed drag marks leading away from the road to the base of a tree. This spot was covered with insects, and they discovered blood and what appeared to be brain tissue in the vegetation surrounding the area. Detective Sneed said that it looked like someone had swept the road around the gate with a broom.

At this point, a cadaver dog was unleashed. The dog started digging beneath the gate, and a large pool of blood was discovered. A second blood-stained area was later discovered. Both areas had been covered with leaves. The bark of a tree near the road showed either buckshot or shotgun blasts. The banks of Helican Road were about one to two feet high, and a section of the bank appeared to have been cut across by a vehicle's bumper or tailgate.

Defendant's campground was approximately eight-tenths of a mile from the gate on Helican Road. Detective Sneed said that Defendant's camp was very clean when they searched it. Pieces of a blue tarp were visible in the fire pit. Detective Sneed said that Defendant voluntarily gave him his logbook and his gun, which had been recently cleaned.

Detective Sneed said that the victims' bodies were found four days after they were killed in another illegal dump site on Big Fork Road in neighboring Marion County. Detective Sneed said that the site was approximately thirteen miles from the gate area on Helican Road and was accessible from Helican Road without driving off of Signal Mountain. The bodies rested on the ledge of a bluff approximately fifty to sixty feet below the road's surface. The bodies were stacked on top of each other about five or ten feet from the edge of the bluff and covered with brush and barbed wire. Detective Sneed said that the bodies were visible from the road.

On cross-examination, Detective Sneed said a warranty deed dated June 30, 1988, showed that Defendant owned approximately 130 acres around Helican Road which had been purchased from Cartter Patten. The property abutted the "blue hole," but Defendant did not own the pond.

-4-

Detective Sneed said that he understood that Defendant had permission to use the property before title was actually transferred.

Detective Sneed said that he found a pistol wrapped in a towel in the tool box of one of the red ATVs but did not test the pistol to see whether it had been fired. Detective Sneed confirmed that there was only one drag mark leading from Helican Road into the woods. He said that they had not found any blood in the drag mark. None of the shotgun casings or waddings found in the area around the gate were fired with Defendant's gun.

Detective Sneed said that Defendant initially arrived at the command center on Roberts Mill Road in a neighbor's car. Detective Sneed drove Defendant back to the neighbor's house where his Jeep Scrambler was parked. Detective Sneed said that Defendant voluntarily let the police officers examine his vehicle, gun and log book. Detective Sneed said that the police did not do a gunpowder residue test on Defendant's clothes and were unable to retrieve any soil samples from Defendant's Jeep because it had been recently washed. No blood was found on the tarp remnants in Defendant's fireplace, and no test was run to determine if the material was actually from a tarp. Detective Sneed said, however, that the fragment of cloth contained a grommet and eyelet consistent with those generally found on a tarp. Detective Sneed did not notice a tarp when he later searched Defendant's garage. Detective Sneed conceded that no DNA tests were performed on the blood samples gathered from the Helican gate area and the ATVs, and the blood samples were subsequently destroyed. Detective Sneed said that one of the red ATVs weighed 410.1 pounds and the second red ATV weighed 363.8 pounds. The red, white and blue ATV weighed 291.1 pounds.

Frank King, the Hamilton County medical examiner, examined some of the bone fragments and tissue found at the Helican gate before the victims' bodies were discovered. He said that the bone chips were consistent with the bones in a human skull but could not identify the samples with one hundred percent accuracy. Dr. King said, however, that the bone chip had lead markings on the fractured edge which is typically found when a bullet strikes a bone. Dr. King could only determine that the tissue substance found at the scene was from either a human or an animal. Dr. King said that the path of the blood down one of the ATVs was consistent with the victim sitting on the ATV when he was shot.

Dr. King said that Mr. Griffith died from a gunshot injury to the head. The bullet entered the left side of the victim's head just above and behind the left ear and exited the right side of the victim's head. Portions of the victim's skull were not found with the body. There was a slight downward trajectory from the entry to the exit wound consistent with the shooter standing and the victim sitting when the injury was inflicted. Mr. Griffith also had postmortem abrasions to the chest area consistent with the body being dragged over a rough area. Dr. King could not say whether the bone fragments found at the scene came from Mr. Griffith's skull. The victim would have lost consciousness immediately after the gunshot with death occurring within a few seconds to one or two minutes later.

Dr. King said that Mr. Mason died of a shotgun wound to the chest. The pellets entered the left side of his body and traveled in a downward trajectory toward the victim's back. The path of the pellets was consistent with the shooter standing and the victim sitting when the gun was fired. Shotgun pellets were found in the back of Mr. Mason's right chest and shoulder. The shotgun pellets entered the victim's body relatively close together indicating that the victim was shot at close range. The large wound would have bled considerably. Dr. King said that the gunshot wound was fatal, but the victim would not have lost consciousness for a minute or two.

Mr. Smock suffered two shotgun wounds. The first wound, unlike Mr. Mason's and Mr. Griffith's, was caused by small pellets, or "birdshot." The pellets entered Mr. Smock's right shoulder and upper chest and traveled in a straight line. Two pieces of shotgun wadding were found in the wound indicating that the shotgun was fired at close range. The second wound was in Mr. Smock's lower left shoulder. The pellets were larger than those found in the first wound and traveled upward and to the right. Dr. King said the wound was consistent with the shooter standing over the victim when he fired the shotgun the second time.

On cross-examination, Dr. King said that he could not tell what type of gun was used. He also conceded that Mr. Smock could have been shot by two different people or two different guns. Dr. King confirmed that all three men weighed over two hundred pounds at the time of their death.

Kelly Fite, a firearms examiner with the Georgia Bureau of Investigation, examined Defendant's 12-gauge, pump-action shotgun on July 23, 1988. Mr. Fite said that Defendant's gun held seven rounds of ammunition and was capable of firing seven shots in a row. The interior of Defendant's gun, however, had no imperfections which would mark the wadding. The wadding found at the Helican gate also had no markings. On cross-examination, Mr. Fite said that he fired Defendant's gun ten times, and there were no marks on the wadding to distinguish one test from the other.

Vincent Dale Brown lived on Roberts Mill Road at the time of the incident. On July 9, 1988, he was helping a friend move off of Signal Mountain between 11:00 a.m. and 1:00 p.m. When Roberts Mill Road narrowed to one lane, Mr. Brown jumped out to stop traffic so the truck could get down the mountain. One of the vehicles he stopped belonged to Defendant. Defendant's Jeep was covered with mud. Defendant told Mr. Brown he and his wife were going up to his property to camp. Mr. Brown said he went back to Signal Mountain after the move was finished. Mr. Brown was standing in a friend's yard on Hixon Road between 6:00 p.m and 8:00 p.m, when he heard six or seven shots from the direction of Helican Road. A trail off of Hixon Road led to the gate area on Helican Road.

Mr. Brown said that he had heard that someone had bought the property leading up to the "blue hole." There were "no trespassing" signs on the road, but he did not pay any attention to them. One day, when he started down Helican Road, Defendant approached him, carrying a shotgun. Defendant appeared angry. Mr. Brown said that Defendant calmed down when he recognized Mr. Brown as the cousin of the man who worked on his Jeep. Mr. Brown followed Defendant to his

camp site where Defendant recorded his name in a log book. Mr. Brown said he noticed a blue tarp at Defendant's campsite. On cross-examination, Mr. Brown said that Defendant told him he could hunt on the property if he called first. Mr. Brown did not remember whether or not he testified about the blue tarp during Defendant's first trial.

Pam O'Neal was camping on her property near Jake's Campground on July 9, 1988. Around dinner time, she heard the sound of more than one ATV traveling on her property. Later that evening, she heard five or six gunshots. Ms. O'Neal left her property around 2:00 a.m. As she drove home, Ms. O'Neal noticed a Jeep Scrambler coming from the area of Taft Road on Carroll Road.

William Wiggins lived near Boston Branch Lake on Signal Mountain. Mr. Wiggins said that around 7:00 p.m. or 7:30 p.m. on July 9, 1988, he heard a rapid series of five to eight shots coming from the direction of Helican Road. On cross-examination, Mr. Wiggins agreed that, on previous occasions, he had heard shots from that direction during hunting season. Mr. Wiggins said that he had never been on Helican Road.

Donna Anderson testified that she and her boyfriend were on Signal Mountain during the early morning hours of July 10, 1988, looking for her boyfriend's son who was supposed to be camping. They were driving down Roberts Mill Road between 12:30 a.m. and 1:00 a.m. when Ms. Anderson saw a Jeep coming in the opposite direction. Because Roberts Mill Road narrowed down to one lane at that point, Ms. Anderson and her boyfriend pulled over and stopped. The Jeep's driver got out of the Jeep for a minute and then got back in and drove up the road. When he was even with Ms. Anderson's vehicle, the Jeep's driver looked at her and said "sorry about that." Ms. Anderson said there was a cover over the back of the Jeep, and the Jeep's rear end was riding close to the ground. Ms. Anderson identified Defendant's son, Donnie Casteel, as the driver of the Jeep during a photographic lineup.

On cross-examination, Ms. Anderson said that the Jeep's headlights were not shining in her face but were shining upward. The windows on both vehicles were rolled down, and Ms. Anderson leaned forward so she could see the other driver's face. Ms. Anderson admitted that she initially described the Jeep as a "regular" Jeep to the police. She denied that she said the Jeep had a rag top in her original statement. Ms. Anderson said she meant that there was a canvas pulled across the Jeep's bed.

Janice Hall spent July 9, 1988 with a friend who lived on Sawyer Road near Roberts Mill Road. Ms. Hall testified that she was awakened in the early morning hours of July 10 by the sound of a vehicle's tires on the road. Ms. Hall said that the vehicle made three or four trips back and forth on the road with approximately twenty minutes between trips. On cross-examination, Ms. Hall admitted that Defendant's Jeep drove past her friend's house the next morning, and that she did not particularly notice any sound made by the Jeep's tires as it passed. Ms. Hall said that a woman was driving the Jeep on Sunday morning.

Herschel Green's testimony from Defendant's first trial was read in the record. Mr. Green said that he was on his front porch around 5:00 a.m. on July 10, 1988, drinking coffee. Mr. Green said that he heard Defendant's Jeep go by. Mr. Green admitted that he could not see the Jeep from his porch.

The State recalled Mr. Brown as a witness. Mr. Brown testified that he warned Defendant that people would not like it if he closed Helican Road so that people could not swim at the "blue hole." Mr. Brown said that Defendant replied that he could take care of the trespassers.

James Walling testified that he was driving to work on Roberts Mill Road around 6:00 a.m. on July 10, 1988. He saw Defendant's Jeep coming up the mountain above the dump site. Although it was dark in the woods at this time of the morning, Defendant did not have his headlights on.

John Lines was Chief of the Walden Rescue Unit at the time of the killings. On Sunday, July 10, 1988, he was driving to the fire hall on Taft Highway on Signal Mountain when he stopped to wash his car. A woman was in the next stall washing a Jeep. Mr. Lines noticed the vehicle because he saw blood in the back of the Jeep when he drove in. The woman told Mr. Lines that she had taken a pig to the slaughterhouse. Mr. Lines received a call about the three missing men while he was at the carwash. He jotted down the license tag number of the Jeep on a piece of paper. Mr. Lines said that he saw Defendant driving a Jeep with the same license tag number two days later. Mr. Lines said that he lost the piece of paper with the Jeep's license tag number.

On cross-examination, Mr. Lines said that his conversation with the woman driving the Jeep lasted approximately twenty seconds, but admitted that he could not identify either her or Defendant from photographs during the first trial. Mr. Lines denied that he did not mention seeing the woman at the car wash until Defendant's second trial. Mr. Lines believed that he told several officers about the incident. Mr. Lines admitted that he first said that the vehicle at the car wash was a pick-up truck, but he was now positive that the vehicle was a Jeep Scrambler. He admitted that he said during Defendant's first trial that he saw the vehicle again on Monday, not Tuesday.

Terry Mills and Jeff Mann went to the "blue hole" on Saturday afternoon, July 9, 1988. Mr. Mills said that Helican Road was frequently traveled by people who were going swimming at the "blue hole." Mr. Mann said he had been going to the swimming hole since he was ten or eleven. Mr. Mann said that he thought that Helican Road was a public road.

Mr. Mills described Helican Road as a dirt road crossed by streams and filled with mud holes that only a four-wheel drive vehicle or an ATV could navigate. Mr. Mills said that when he was on the road on July 9, he and his friend had to remove some barbed wire that was strung across the gate on Helican Road and some branches which lay across the road. Mr. Mills said that he drove through the gate. When he reached the TVA power lines that lay beyond the gate between 3:00 p.m. and 3:30 p.m, Defendant walked up to his truck. Defendant's face was red, and he appeared angry. Defendant held up his shotgun and told the two men not to come any closer. Mr. Mills got out of his vehicle and held his arms in the air to show Defendant he was not armed. Defendant told them he was going

to keep people off his property, "no matter what [he had] to do." Both men said they were scared. Defendant made them sign their names, a description of the vehicle, and the vehicle's license tag number in a log book. Mr. Mills and Mr. Mann were the last people to sign Defendant's book.

Mr. Mills said that Defendant had a small camp under the power lines with a makeshift tent made from a tarp, some chairs, a table and a lantern. A Jeep Scrambler was parked at the campsite. Mr. Mills denied that he told the police that he did not know whether or not there was a tarp at the campsite. Mr. Mann admitted that Defendant never actually pointed his shotgun directly at them.

Portia McDowell and her husband owned a nursery on Big Fork Road. Ms. McDowell took daily walks down the road which led past the illegal dump site. On Friday, July 8, 1988, Ms. McDowell walked past the dump site and did not notice anything unusual. On Monday, July 11, 1988, she noticed a foul odor emanating from the dump and a lot of insects swarming the area. Ms. McDowell said that the dump site appeared to have been swept, and the trash had been moved to one big pile.

Mark Sively owned property on Sively Trail. Helican Road was approximately one hundred yards from the back of his property. Mr. Sively found Mr. Griffith's knife in the middle of Helican Road during the search on Monday, July 11, 1988. Mr. Sively said that he and Defendant discussed Defendant closing Helican Road to the public on the Saturday before the killings. Defendant showed Mr. Sively his log book at that time and told him as long as he had his gun, Defendant would not have any trouble.

Defendant also stopped David Mosteller and Derek Belk on Helican Road when they attempted to drive to the "blue hole" in June. Defendant rested his shotgun against the truck's door frame and told the two men if they did not leave, he would shoot. Defendant recorded their names in his log book and allowed them to turn around at Defendant's campsite. Mr. Belk said that he noticed a tent made from a blue or green tarp at the campsite but conceded that he did not mention the tarp at Defendant's first trial.

On June 11, 1988, Defendant stopped Delores Kennedy and Michael Killingsworth after they had driven through the gate on Helican Road. Defendant cocked his shotgun and stuck it through the truck's window, with the barrel pointed at the dashboard. Defendant told them they were in trouble for trespassing. Defendant allowed the couple to leave after recording their names in the log book.

Judith and Milton Lowery, along with their children and some other friends, were swimming in the "blue hole" on June 18, 1988 when Defendant appeared at the pond with a 12-gauge shotgun. He told Ms. Lowery to tell the men to come down from the cliffs. When her husband came down to the pond area, Defendant stuck the gun in Mr. Lowery's face and told him he was lucky there were women and children present. Ms. Lowery said Defendant's finger was on the trigger of his gun, and the gun was pointed toward her husband. Ms. Lowery said that Defendant marched the family up

the hill, women and children first, followed by the men. Defendant walked behind the group with his gun pointed at Mr. Lowery's back.

James Perry, Gary McDowell, Jonathan Ewton, Michael Dantzler, and Paul Meeks had similar encounters with Defendant between April 1988 and July 1, 1988. All of them testified that Defendant appeared suddenly as they drove up to the gate on Helican Road and demanded that they leave. Defendant was armed during the encounters and appeared angry. Defendant told Mr. McDowell that he was having trouble with trespassers and specifically mentioned Richard Mason's name.

On the other hand, Defendant permitted Steve Craig and his friends to swim at the "blue hole" because they volunteered to pick up trash around the site. Mr. Craig said he later called Defendant and made a second date to return to the swimming hole on July 7, 1988. He and his friends spent the day swimming without incident. Defendant told Mr. Craig that he did not have as much trouble with the pick-up trucks because the drivers usually turned around when they saw the "no trespassing" signs. Mr. Craig said that Defendant said it was the four-wheelers that were a problem and that he was going to kill one of them one day. Defendant became angry when he talked about the ATVs that used Helican Road. Mr. Craig said that Defendant was carrying a gun when he met him.

Sharon Marie Hill began dating Defendant in August 1996, even though she knew Defendant was married. Ms. Hill said she had heard about the killings but did not know Defendant's connection with the incident. In September 1996, Ms. Hill received an anonymous letter with newspaper clippings about the murders. Defendant told her to ignore the letter and said that other people had received similar letters. In a second letter, the writer said that "[w]e were up there camping, and these men came up on the three-wheelers and he shot them because they were disturbing him, and he sent me home." The letter was signed "Boozie." Defendant told her the letter was "bogus." A third letter was sent to Ms. Hill's neighbors informing them that Ms. Hill was dating a murderer and putting their lives in danger. The first and third letters were unsigned. Ms. Hill gave Defendant the correspondence.

Ms. Hill agreed to assist the police in their investigation after she received the second letter. Susie Casteel, Defendant's wife, came over to Ms. Hill's house around 2:30 a.m. the next morning while Defendant was visiting. During a taped five-hour conversation, Ms. Casteel said to Defendant that she was "drug down to the police station and fingerprinted because of what you [had] done." Ms. Hill said that Defendant did not respond to Ms. Casteel's comment.

Later that day, Defendant returned to Ms. Hill's house, and Ms. Hill asked him to return the letters about the murders. Defendant initially gave her the letters, but while Ms. Hill was momentarily out of the room, Defendant substituted a blank piece of paper for the letter signed "Boozie." When Ms. Hill later confronted Defendant about the substitution, Defendant admitted that he had burned the letter because it "could be harmful to him." Ms. Hill later found out that Ms. Casteel's nickname was "Boozie."

Ms. Casteel testified on Defendant's behalf. She said that she was still married to Defendant at the time of his second trial. The Casteels first considered purchasing the Patten property in March 1988. Mr. Patten told them they could use the property until the purchase was completed in June 1988. Ms. Casteel said that she and Defendant went to the campsite on the property frequently during this period of time. They put up "no trespassing" signs with their telephone number, and began to stop people traveling Helican Road to tell them the land was privately owned. The sheriff's department suggested they keep a record of everyone who tried to pass through the gate on Helican Road so that they could swear out an arrest warrant if necessary. Ms. Casteel said that she never saw Defendant point a gun at anyone.

The Casteels' wedding anniversary was July 9, 1988. Ms. Casteel said that she and her husband planned to spend the weekend camping on their property. After they arrived at the camp site near the TVA power lines, Ms. Casteel went swimming in the "blue hole," and she and Defendant later cooked some hot dogs. Ms. Casteel said that she did not hear any gunshots that night but said that the noise of the rushing creek near the pond was loud. She and Defendant left the swimming hole after it was dark and returned to the campsite.

Ms. Casteel said that she had received a blue tarp that day as an anniversary present and denied burning the tarp in the fire pit. Ms. Casteel said that the tarp was in their garage when the police later searched her home.

The Casteels' collie got sick during the night. Early the next morning, July 10, 1988, Ms. Casteel and Defendant left the campsite to take the dog home. They had to turn around, however, because Ms. Casteel had left her pocketbook at the campsite. Ms. Casteel dropped Defendant off at the beginning of Helican Road and then drove home to attend to the dog. Ms. Casteel said that she gave the dog some medicine and headed back to Signal Mountain in about fifteen to twenty minutes. Ms. Casteel said that she did not wash the Jeep that morning.

Ms. Casteel's brother and sister-in-law, Ronnie and Brenda Lewis, were at the campsite when Ms. Casteel returned around 9:00 a.m. to 9:30 a.m. The two couples left the property between 1:00 p.m. and 2:00 p.m. Defendant returned to the swimming hole later that afternoon with his daughter and her friend while Ms. Casteel stayed in town. Ms. Casteel said that her son, Donnie, spent the entire weekend with his grandparents.

Ms. Casteel said that she wrote the letters to Ms. Hill because she was upset and angry over Ms. Hill's relationship with Defendant. Ms. Casteel said that she wanted to scare Ms. Hill so that she would break up with Defendant. Ms. Casteel said that when she told Defendant she was upset about being fingerprinted, she just meant that she was upset over the investigation in general and people's reaction to the killings. Ms. Casteel said that Defendant did not kill the three men, and she did not see or hear anything on either July 9 or July 10, 1988.

On cross-examination, Ms. Casteel admitted that she had sent the three letters to Ms. Hill. Ms. Casteel reiterated that she just wanted to scare Ms. Hill and said that she did not even know the

police had her letters until after Defendant was arrested. She admitted that she did not tell the police why she wrote the letters. Ms. Casteel said that Defendant was at the camp site with her brother and sister-in-law when she returned. Ms. Casteel admitted that the Jeep was equipped with a winch for towing but explained that the winch was located in the front of the vehicle and that the Jeep would be damaged if the winch was used to tow something behind the vehicle.

Donnie Casteel testified that he worked from 2:30 p.m. to 11:30 p.m. on July 9, 1988. He went to his grandparent's house after he got off work and slept until about 10:30 the next morning. Donnie Casteel's grandparents confirmed that he was at their home on July 9 and July 10, 1988.

Ronnie Lewis said he arrived at Defendant's campsite on July 10, 1988, around 8:45 a.m. but found it deserted. Mr. Lewis said that the only thing different about the property on this visit was the barbed wire that was strung across the gate. Mr. Lewis said that there was a tarp pulled across a wire between two trees at the camp site. Defendant arrived at the camp about five minutes after Mr. Lewis and his wife. Defendant told Mr. Lewis that he had been up all night with his dog, and Mr. Lewis said that Defendant looked fatigued. Ms. Casteel arrived about forty-five minutes later. Mr. Lewis said that he did not see any blood on Defendant or anywhere in the camp.

On cross-examination, Mr. Lewis conceded that he noticed a few odd things about the camp when he first arrived. Defendant had left his shotgun leaning against a tree, a fire was smoldering in the fire pit, there was one walkie talkie in the camp, and no vehicles. Mr. Lewis said that he did not see Defendant on Helican Road when he drove in even though Defendant approached the camp from that direction. Mr. Lewis said that Defendant was out-of-breath as if he had been running, and Mr. Lewis assumed Defendant had tried to catch up with him. Mr. Lewis did not remember seeing a pocketbook at the camp site. Mr. Lewis said that Ms. Casteel did not enter the camp from Helican Road but approached the camp from a point above the power lines which was a longer route. Mr. Lewis said that Ms. Casteel appeared frustrated.

Raymond Harden testified that he lived at the bottom of Roberts Mill Road. On July 9, 1988, Mr. Harden was returning home around 7:30 p.m. A car was blocking the road at the top of the hill, and Mr. Harden had to ask Sandy Smith to move her car so he could pass. As he passed the dump site, Mr. Harden saw a black pick-up truck backed up to the dump. One of the Hickman brothers was standing in the back of the truck, and the other brother was standing next to the truck. Mr. Harden said the Hickmans were pushing two red ATVs out of the back of the truck. The vehicles had blood on the seat and gas tank. Mr. Harden asked them what they were doing, and one of the brothers told him he needed to leave, so Mr. Harden left. Mr. Harden said that he never told anyone this story because he was afraid the Hickman brothers would harm his wife and children.

On cross-examination, Mr. Harden admitted that he never saw either one of the Hickman brothers after July 9, 1988.

On this evidence, the jury found Defendant guilty of the first degree murder of Richard Mason, Kenneth Griffith and Earl Smock.

## I. Disqualification of the Hamilton County District Attorney General's Office

Prior to the commencement of the second trial, Defendant filed a motion to disqualify the Hamilton County District Attorney General's office as prosecutor because Christopher Poole, an attorney on Defendant's defense team during his first trial, was an assistant district attorney at the time of Defendant's second trial.

At the hearing on Defendant's motion, Mr. Poole testified that his father, Don Poole, was one of the lawyers retained by Defendant to represent him during his first trial. Christopher Poole was assigned to work on Defendant's case when he began working for his father in September 1997. Mr. Poole said that his assignments included researching, writing memoranda, interviewing witnesses, and attending defense strategy sessions. Mr. Poole said that he had also met with Defendant but never alone. Mr. Poole was present during Defendant's first trial, but did not participate. Mr. Poole conceded that the majority of his time while he was working at his father's law firm was spent on Defendant's case.

Mr. Poole said that he started working for the district attorney's office during the first week in October 1998. Defendant's motion for new trial was pending at that point, and the hearing on Defendant's motion was held on November 3, 1998. Mr. Poole was not permitted to represent the State in any cases that were assigned to the criminal court division in which Defendant's case was heard. (Hamilton County had three criminal court divisions.) Mr. Poole said that all of the attorneys in the district attorney general's office had access to the office's files, and could access any case on the computer. The Supreme Court denied the State's application for permission to appeal from the Judgment of the Court of Criminal Appeals in September 2001. District Attorney General William Cox then forwarded a notice to all employees in the prosecutor's office informing them that Defendant's case had been remanded and was set for arraignment in November. General Cox reminded the employees to refrain from any discussions about Defendant's case with Christopher Poole. Mr. Poole testified that he did not discuss Defendant's case with anyone, never accessed Defendant's files, and no one in the district attorney's office asked him any questions about the case.

The trial court found that Mr. Poole's affidavit and testimony rebutted the presumption of shared confidences that arose as a result of Mr. Poole's employment with the district attorney's office and denied Defendant's motion to disqualify the entire office. Defendant argues that the trial court erred in denying his motion. Defendant submits that the combination of the lack of screening procedures in the district attorney general's office and Mr. Poole's unfettered access to the office's files falls short of isolating Mr. Poole from the rest of the staff. Alternatively, Defendant argues that Mr. Poole's current employment creates an appearance of impropriety requiring the disqualification of the entire office regardless of any screening procedures.

A trial court's ruling on the vicarious disqualification of an entire office is subject to an abuse of discretion standard review. *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001). A trial court abuses its discretion whenever "'it appl[ies] an incorrect legal standard, or reach[es] a decision

which is against logic or reasoning that causes an injustice to the party complaining." *Id.* (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Neither the State nor Defendant questions Mr. Poole's disqualification individually from joining the prosecution team in Defendant's case after accepting employment with the district attorney's office. *See State v. Coulter*, 67 S.W.3d 3, 28-29 (Tenn. Crim. App. 2001); *State v. Tate,* 925 S.W.2d 548, 556 (Tenn. Crim. App. 1995); *State v. Phillips*, 672 S.W.2d 427, 436 (Tenn. Crim. App. 1984). The question is whether or not Mr. Poole's presence in the district attorney's office requires disqualification of the entire office. *Coulter*, 67 S.W.3d at 30. Vicarious disqualification is based on the premise that the disqualified attorney is presumed to have shared the former client's confidences with the new firm. *Clinard*, 46 S.W.3d at 183. Vicarious disqualification, however, is not automatic. *Id.*; *Tate,* 925 S.W.2d at 556. Screening methods that insulate the disqualified attorney from any contact with matters arising out of his or her former representation are a viable method of avoiding vicarious disqualification. *Coulter*, 67 S.W.3d at 30 (citing *Clinard*, 46 S.W.3d at 184); *see also* Tenn. Bd. Prof. Resp., Formal Op. No. 89-F-118, 1989 WL 534365, at *3 (Mar. 10, 1989).

Whether or not the State's screening procedures have successfully achieved isolation is determined on a case-by-case basis. *Clinard*, 46 S.W.3d at 184-85; *see also* Formal Op. No. 87-F-111, 1987 WL 364065, at *2 (Sept. 16, 1987). A prosecutor's disqualification need not be imputed to the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution." *Tate*, 925 S.W.2d at 556 (citing *Mattress v. State*, 564 S.W.2d 678, 680 (Tenn. Crim. App. 1977)). This principle has been followed even when a member of the defendant's defense team joins the district attorney's office while the defendant's case is still pending. *See State v. Steve Mason*, No. 01C01-9603-CC-00103, 1997 WL 311900 (Tenn. Crim. App., Nashville, June 6, 1997), *perm to appeal denied* (Tenn. 1997).

The State, through Mr. Poole's testimony and affidavit, showed that Mr. Poole had been sufficiently isolated from anyone participating in the prosecution of Defendant's case or from any information dealing with Defendant's trial. Moreover, there is no evidence that Defendant was in any way prejudiced by Mr. Poole's employment with the district attorney's office during Defendant's second trial. Based on the facts presented in this case, we find that the presumption of shared confidences was adequately rebutted. The trial court did not abuse its discretion in denying Defendant's request to disqualify the Hamilton County District Attorney General's Office from prosecuting his case.

Nonetheless, Defendant argues that Mr. Poole's presence in the district attorney's office during his second trial creates an appearance of impropriety regardless of the effectiveness of the office's screening procedures. In *Clinard*, our supreme court recognized that in rare circumstances an appearance of impropriety may provide a basis for disqualification even when the firm's screening procedures are adequate. *Clinard*, 46 S.W.3d at 187 (quoting *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)). This is not such a case.

At the time of Defendant's second trial, Ethical Consideration 9-6 of Canon 9 of the Tennessee Code of Professional Responsibility states that "[e]very lawyer owes a solemn duty . . . to avoid not only professional impropriety but also the appearance of impropriety." Although ethical considerations are aspirational only, "the appearance of impropriety is essential to the integrity of the legal profession." Tenn. Code of Prof'l Resp., Preliminary Statement; *Clinard*, 46 S.W.3d at 186.

While the concept of the appearance of impropriety may appear to be amorphous, the standard is not without rules to aid in its application. *Id*. at 187. "[T]he mere possibility of impropriety, [for example,] is insufficient to warrant disqualification." *Coulter*, 67 S.W.3d at 31 (citing *Clinard*, 46 S.W.3d at 186). Whether or not the appearance of impropriety rises to a level requiring disqualification is viewed from the perspective of a reasonable layperson with knowledge of all of the facts including the screening procedures that were used by the firm or office. *Coulter*, 67 S.W.3d at 31.

The supreme court, for example, has applied this standard to disqualify an entire law firm when the new associate "not only switched teams, [but] switched teams in the middle of the game after learning the signals." *Clinard*, 46 S.W.3d at 187. As the *Coulter* court noted, however, *Clinard* dealt with the transition of an attorney from one private firm to another, and in the context of civil proceedings. *Coulter*, 67 S.W.3d at 31. The intermediate courts of appeal have followed different paths in examining the need for disqualification of an entire office. *Id.* at 32. "That difference can be explained, at least in part, by the distinction between lawyers in government service and those in private practice and by the difference between criminal proceedings and civil proceedings. The cases reflect an understanding that applying the imputed disqualification doctrine to district attorney generals' offices in the same way that it is applied to private law firms would seriously hamper the prosecution of criminal cases." *Id.* (quoting *Clinard*, 46 S.W.3d at 188.)

A panel of this court recently observed that

> [p]rivate and public practice have significant distinctions, such that screening procedures for attorneys in government service are generally viewed with less skepticism: "The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice."

*State v. Ricky Raymond Bryan*, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890 (Tenn. Crim. App. Nashville, Aug. 4, 2000) (quoting *United States v. Caggiano*, 660 F.2d 184, 191 (6th Cir. 1981)); *see also* Tenn. Sup. Ct. R. 8, EC 7-13 (repealed 2003). As a result, the implementation of screening procedures usually resolves the problems pertaining to actual conflicts or the appearance of impropriety. *See Tate*, 925 S.W.2d at 556. Mr. Poole had no contact with any aspects of Defendant's case and did not in any way participate in the prosecution of his case. *See Phillips*, 672 S.W.2d at 435. Defendant's first trial was over when Mr. Poole joined the district attorney's office,

and the second trial did not commence for some time thereafter. Based on the facts presented here, we cannot conclude that Mr. Poole's presence in the district attorney's office during the pendency of Defendant's trial warranted disqualification of the entire office. Defendant is not entitled to relief on this issue.

Defendant further argues that the Hamilton County district attorney's office would clearly be disqualified under the new Tennessee Rules of Professional Conduct, which became effective March 1, 2003. As Defendant observes, the new Rules of Professional Conduct recently adopted by the supreme court replace the Code of Professional Conduct that was existing at the time of Defendant's trial. The Rules have prospective application only and apply to any relationship existing on or conduct taken after March 1, 2003. If this case was remanded for a new trial, the new Rules would govern any issues of vicarious disqualification that might arise because of the relationship, if any, existing between Mr. Poole and the district attorney's office at the time Defendant would be tried again. *See* Tenn. Sup. Ct. R. 8, RPC 8.5.

In support of his argument, Defendant relies on Rule 1.10 which reiterates the rule of law stated in *Clinard* that screening policies are generally not effective to avoid an entire firm's imputed disqualification when an attorney "switches" sides during the course of pending litigation. Tenn. Sup. Ct. R. 8, RPC 1.10(d), Cmt. (9) (2004); *see also* Tenn. Bd Prof. Resp., Formal Op. No. 03-F-147, 2003 WL 21540653, at *2 (June 13, 2003). Rule 1.10, however, addresses the vicarious disqualification issues that arise when a lawyer moves from one private firm or corporate legal office to another. Tenn. Sup. Ct. R. 8, RPC 1.10, Commentary (1)(2003).

Rule 1.11(c), on the other hand, specifically governs situations arising when a lawyer leaves private practice to represent the government. Tenn. Sup. Ct. R. 8, RPC 1.11(c), Cmt. (10) (2003). Rule 1.11(c) states that a government lawyer shall not "participate in a matter in which the lawyer participated personally and substantially while in private practice." *Id.* at 1.11(c)(1). The disqualification in this situation is personal, and "[p]aragraph (c) does not disqualify other lawyers in the agency with which the lawyer in question has become associated." *Id.* at 1.11, Cmt. (8). Neither Rule 1.10 or 1.11 adopts an appearance of impropriety standard. *Id.* RPC 1.10 and 1.11; *see also* Tenn. Bd. Prof. Resp., Formal Op. No. 03-F-147, 2003 WL 21540653, at *2 (June 13, 2003). Thus, assuming that Mr. Poole would still be employed by the district attorney's office at the time of a theoretical third trial of Defendant, and assuming that no further or new screening procedures would be implemented by the office, it appears that Mr. Poole's lack of any contact with or participation in Defendant's trial would be sufficient to insulate the district attorney general's office from imputed disqualification under Rule of Professional Conduct 1.11(c). Accordingly, assuming *arguendo* that it was error on the part of the trial court not to disqualify the Hamilton County district attorney's office from prosecuting Defendant's second trial, such error would be harmless in light of the new Rules of Professional Conduct. A new trial would not give Defendant any benefit of being prosecuted by a prosecutor in place of the Hamilton County District Attorney.

## II. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support his three convictions of first degree premeditated murder. In support of his argument, Defendant argues that the evidence against him was entirely circumstantial and did not reasonably exclude Defendant's theory that Mr. Hickman was the perpetrator of the crimes. Defendant also contends that the evidence failed to establish with any credibility how Defendant could have transported the three ATVs across the mountain to the illegal dumpsite where they were eventually found. On the contrary, Defendant argues that the evidence supports his claim of innocence in that (1) scientific testing failed to match the shotgun shells and wadding retrieved from Helican Road to Defendant's gun; (2) the palm print found on one of the ATVs did not belong to either Defendant or his wife; (3) Defendant voluntarily cooperated with the investigating officers after the offenses and permitted them to examine his log book, gun and Jeep; (4) tests performed by the investigative officers established that a person swimming at the "blue hole" would not be able to hear gunshots fired at the gate on Helican Road; (5) photographs of Defendant's garage taken after the offenses clearly show a blue tarp; (6) the investigative officers verified that Donnie Casteel was at work until approximately 10:00 p.m. on July 9, 1988; and (7) Ms. Casteel offered a plausible reason as to why she wrote the letters to Ms. Hill concerning Defendant's involvement in the murders.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Although the evidence of Defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). The circumstantial evidence, however, must be not only consistent with the guilt of the accused but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypotheses except that of guilt. *Tharpe*, 726 S.W.2d at 900. In addition, "'it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" *Id.* (quoting *Pruitt v. State*, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

At the time of the killings, first degree murder was defined as "[e]very murder perpetrated by means of poison, lying in wait or by other kind of willful, deliberate, malicious, and premeditated killing." Tenn. Code Ann. § 39-2-202(a) (Supp.1988) (repealed 1989). "[P]remeditation requires proof of a previous intent to kill, while deliberation requires proof of a 'cool purpose' that includes some period of reflection during which the mind is free from passion and excitement." *State v. Bush*, 942 S.W.2d 489, 501 (Tenn. 1997) (citing *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992)).

The identity of the perpetrator is an essential element of any crime. *See State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Sufficient proof of the perpetrator's identity may be proven through circumstantial evidence alone where the facts "'are so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone.'" *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993)).

Whether the defendant acted with premeditation and deliberation may also be established by circumstantial evidence. *Brown*, 836 S.W.2d at 541. If there is no direct evidence as to the defendant's state of mind before, during and after the killing, the elements of premeditation and deliberation may be inferred from the circumstances surrounding the offense. *State v. Schaffer*, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997). As with direct evidence, the weight accorded circumstantial evidence and the inferences drawn from such evidence are factors left primarily to the jury. *State v. Marable*, 313 S.W.2d 451, 457 (Tenn. 1958). Factors which may support the existence of a premeditated and deliberate killing include the defendant's prior relationship with the victim, the nature or particular cruelty of the killing, the use of a deadly weapon on an unarmed victim, the infliction of multiple wounds, the destruction or secretion of evidence, and the defendant's calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *Bland*, 958 S.W.2d at 660; *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993).

Although the State's evidence was entirely circumstantial, there is sufficient evidence that Defendant was the perpetrator of the offenses and that the killings were willful, deliberate, malicious and premeditated. Defendant first considered buying the property abutting the "blue hole" in March 1988, and, once negotiations were commenced, he used the property even prior to the closing in June 1988. Defendant placed "no trespassing" signs on Helican Road and began to patrol the area for people traveling down Helican Road to the swimming hole. Defendant maintained a rudimentary camp close to the gate on Helican Road and stopped numerous people between April and July 9, 1988 to prevent them from proceeding further down the road. The majority of those stopped testified that Defendant carried a gun during these encounters and appeared angry and agitated over their presence on his property. Defendant repeatedly said that he was going to stop trespassers and would shoot a trespasser if he had to. Defendant specifically mentioned one of the victims, Richard Mason, as a trespasser on his property. Defendant kept a log book with the name of each person he stopped and the vehicle registration number of his or her vehicle.

Defendant admitted that he and his wife were at his campground near Helican Road on the day of the killings. Ms. Casteel said that July 9, 1988, was their wedding anniversary, and she and her husband had received a blue tarp as an anniversary gift. Remnants of a blue fabric with an eyelet

and a grommet was found in Defendant's campfire. Several people heard rapid shots from the gate area on Helican Road before dark on July 9, 1988. Several more witnesses saw or heard Defendant's Jeep on the mountain that night and during the early morning hours of July 10. Although Defendant's son, Donnie Casteel, worked until 10:00 p.m. on July 9, Ms. Anderson saw him driving on Big Fork Road near where the bodies were found between 12:30 a.m. and 1:00 a.m. on July 10. A woman was seen washing blood out of Defendant's Jeep the morning after the killings. The wadding found in Mr. Smock's wound was consistent with Defendant's 12-gauge shotgun. Mr. Mason's and Mr. Griffith's wounds were consistent with the shooter standing over them as he fired the shotgun. Mr. Smock's wounds were consistent with one shot fired while Mr. Smock was standing, and the second shot fired as he lay on the ground. Ronnie Lewis, Defendant's brother, said that no one was at Defendant's campsite when he arrived Sunday morning. Although he did not see Defendant on the trail as he drove to the campsite, Defendant appeared in a few minutes from that direction. Ms. Casteel returned to the campsite from a point above the power lines instead of the shorter route over the trail. In a letter, Ms. Casteel told Ms. Hill that Defendant killed three men on ATVs. Defendant burned the letter and told Ms. Hill that he did so because the letter "could be harmful to [Defendant]." Based on this evidence, the jury could have concluded that Defendant committed the murders beyond a reasonable doubt.

At trial, Defendant theorized that Carl Hickman was the perpetrator of the crimes and presented evidence that Mr. Mason and Mr. Hickman had previously had confrontational encounters. These encounters, however, occurred some months before the killings and at a location removed from the scene of the crimes. Mr. Hickman was in Kentucky during the weekend of July 9, 1988. Mr. Harden testified that he saw Mr. Hickman's two sons pushing two red ATVs out of the back of their pick-up truck into the illegal dump site on Roberts Mill Road one Saturday night in July 1988. Mr. Harden said that he did not tell anyone about this encounter for fifteen years because he was afraid that the Hickmans would harm his wife and children. Mr. Harden admitted, however, that the Hickmans had never come to his house or threatened his family since the incident.

Defendant raises the same credibility issues with Donnie Casteel's alibi testimony and Ms. Casteel's explanation of why she wrote the letters to Ms. Hill. The jury obviously accredited the State's witnesses and discredited Defendant's alternative perpetrator theory. As noted above, the jury decides the weight to be given to the evidence presented at trial and whether or not the testimony of a particular witness is credible. *Bland*, 958 S.W.2d at 659. This Court will not substitute its own inferences drawn from the circumstantial evidence for those drawn by the trier of fact. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Defendant is not entitled to relief on this issue.

## III. Rule 404(b) Testimony

Defendant argues that the trial court erred in allowing sixteen witnesses to testify about their encounters with Defendant on Helican Road in the weeks preceding the killings. These witnesses were Terry Mills, Jeff Mann, David Mosteller, Derek Belk, Michael Killingsworth, Delores Kennedy, Donald W. Jones, Jr., Thomas Clark, Judith Ann Hooker Lowery, Nelson Lowery, James Perry, Gary McDowell, Jonathan Ewton, Michael Dantzler, Paul Anthony Meeks and Steve Craig.

John Savor did not testify at Defendant's second trial, and Defendant did not object to Vince Brown's testimony during the second trial. Otherwise, the testimony of those who did testify for the State at Defendant's second trial was in most aspects the same as that presented in the first trial.

Defendant concedes that this Court found that the testimony of each of theses witnesses was admissible under Rule 404(b) of the Tennessee Rules of Evidence to prove Defendant's motive in establishing the perpetrator's identity. *Casteel*, 2001 WL 329538, at \*10-11. Defendant contends, however, that while the testimony of each witness individually might be admissible, the prejudicial effect of so many witnesses far outweighed the probative value of their cumulative testimony. In other words, the trial court should have allowed one or two witnesses to testify, but permitting the other fourteen to testify to similar experiences tipped the balance between probative value and prejudicial effect to the side of prejudice.

Prior to trial, Defendant filed motions under Rules 403 and 404(b) of the Tennessee Rules of Evidence to exclude at least some of the sixteen "encounter" witnesses because the prejudicial effect of their cumulative testimony outweighed the probative value of the evidence. The parties agreed that the trial court would review the prior testimony of each witness from Defendant's first trial in lieu of a Rule 404(b) hearing and make a ruling as to the testimony's admissibility based on that review. The trial court denied Defendant's motions but noted during a hearing that it would entertain a renewed motion at any time Defendant felt the line had been crossed into the realm of cumulative testimony. Defendant raised his objections as to the cumulative nature of the evidence prior to Mr. Belk's testimony and Mr. Killingsworth's testimony. The trial court overruled Defendant's objection on both occasions.

This specific issue of admissibility under Rule 404(b) was raised and decided in Defendant's first appeal. In the first appeal, Defendant argued that the trial court failed to follow the mandates of Rule 404(b), and, even if procedural requirements were met, the danger of unfair prejudice from each witness's testimony outweighed the testimony's probative value. *Casteel*, 2001 WL 329538, at \*4. A panel of this court found that the trial court's failure to follow the procedural requirements of Rule 404(b) was harmless error, and the testimony of the sixteen witnesses listed above was admissible. The probative value of the evidence was not outweighed by the danger of unfair prejudice. *Id.* at \*10-11.

As such, that decision is the law of the case. Under the "law of the case" doctrine, "an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts in the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publishing Co. v. Tennessee Petroleum Underground Storage Tank Board*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted). The doctrine applies not only to issues actually before the appellate court on first appeal, but also to "issues that were necessarily decided by implication." *Id.* Where an original appeal results in a remand to the trial court, "the decision of the appellate court establishes the law of the case, which must be followed upon remand by the trial court and by an appellate court on a second appeal." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003).

Defendant concedes that a panel of this Court found the testimony of each witness admissible on first appeal under Rule 404(b), but focuses his argument on the prejudice from the cumulative, rather than individual, effect of the testimony, apparently under Rule 403 of the Tennessee Rules of Evidence. Rule 403 provides that relevant evidence may still be inadmissible if the evidence is "a needless presentation of cumulative evidence." Tenn. R. Evid. 403. Although Defendant does not cite Rule 403, his argument encompasses Rule 403 concepts.

The tests for balancing probative value against prejudicial effect are different under Rule 404(b) and Rule 403. Rule 403 requires that the prejudicial effect substantially outweigh probative value while Rule 404(b) looks to see whether the prejudicial effect simply outweighs probative value. *Compare* Tenn. R. Evid. 403 *with* 404(b). "Clearly, Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (citing *Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999)). Rule 403's cumulative evidence category is "directed toward promoting judicial economy and efficiency rather than with excluding prejudicial evidence." *State v. Jerry Wayne Pointer*, No. M2001-02269-CCA-R3-CD, 2003 WL 678376, at *16 (Tenn. Crim. App., Nashville, Feb. 28), *perm. to appeal denied* (Tenn. 2003) (citing Neil P. Cohen et al., *Tennessee Law of Evidence*, § 4.03[7] (4th ed. 2000)). The admission of evidence is largely discretional, and a trial court's discretion will not be disturbed on appeal unless there has been clear abuse. *State v. Harris*, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999). We cannot conclude in this instance that the trial court abused its discretion in allowing the testimony of the encounter witnesses. Defendant is not entitled to relief on this issue.

## IV. Adoptive Admission

During a three-way conversation between Ms. Casteel, Ms. Hill and Defendant prior to Defendant's arrest, Ms. Casteel said, "I've had myself drug down to the police station and fingerprinted for what you've done." *Casteel*, 2001 WL 329538, at *22. A panel of this Court on Defendant's first appeal found that the statement was properly admitted by the trial court as an adoptive admission under Rule 803(1.2)(B) of the Tennessee Rule of Evidence. *Id.* Defendant argues that this Court's ruling forced him to introduce evidence of Defendant's affair with Ms. Hill in order to explain the statement. Alternatively, Defendant argues that the probative value of the statement is minimal, at best.

First, we observe that Ms. Hill was the State's witness and first introduced the topic of Defendant's affair with her testimony. The evidence was therefore before the jury and Defendant was not "forced" to introduce proof of the affair. Be that as it may, as discussed above, this Court's ruling that Ms. Casteel's statement is admissible as an adoptive admission is the law of the case which must be followed by the trial court on remand. *James*, 81 S.W.3d at 758. We concluded in *Casteel* that the statement "identified the defendant as the target of the accusation, the defendant knew the reference being made, the accusation was incriminating, and the defendant did not deny the accusation or object to it." *Casteel,* 2001 WL 329538, at *22; *see also State v. Black*, 815 S.W.2d at 176-177. (Tenn. 1991). Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record in this matter, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE